## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI

| | |
|---|---|
| ST. LOUIS COUNTY, MISSOURI,<br><br>*Plaintiff,*<br><br>v.<br><br>ELI LILLY AND COMPANY; NOVO NORDISK INC.; SANOFI-AVENTIS U.S. LLC; EVERNORTH HEALTH, INC. (FORMERLY EXPRESS SCRIPTS HOLDING COMPANY); EXPRESS SCRIPTS, INC.; EXPRESS SCRIPTS ADMINISTRATORS, LLC; ESI MAIL PHARMACY SERVICES, INC.; EXPRESS SCRIPTS PHARMACY, INC.; CVS HEALTH CORPORATION; CVS PHARMACY, INC; CAREMARK RX, LLC; CAREMARK PCS HEALTH, LLC; CAREMARK, LLC; UNITEDHEALTH GROUP, INC.; OPTUM, INC.; OPTUMRX INC.; OPTUMINSIGHT, INC.,<br><br>*Defendants.* | CASE NO. _____<br><br>COMPLAINT<br><br>JURY TRIAL DEMANDED |

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................. 1

II.   PARTIES ............................................................................. 9

    A.    Plaintiff ...................................................................... 9

    B.    Manufacturer Defendants ....................................... 9

    C.    PBM Defendants ..................................................... 13

III.  JURISDICTION AND VENUE ......................................... 29

    A.    Subject-Matter Jurisdiction ................................... 29

    B.    Personal Jurisdiction .............................................. 29

    C.    Venue ....................................................................... 30

IV.   FACTUAL ALLEGATIONS ............................................... 30

    A.    Diabetes and Insulin Therapy ................................ 30

    B.    The Dramatic Rise in the Prices of At-Issue Drugs ........................ 37

            Rising reported prices of Humulin R (500U/mL) from 1997-2021 ...... 38

            Rising reported prices of Humalog vials and pens from 1996-2021 ..... 39

            Rising reported prices of Levemir from 2006-2021 ........................ 40

            Rising reported prices of Novolog vials and pens from 2002-2021 ...... 41

            Rising reported prices of Lantus vials and pens from 2001-2021 ........ 42

            Rising reported prices of long-acting insulins .............................. 43

            Rising reported price increases for human insulins ....................... 45

            Rising reported prices of Type 2 drugs ...................................... 46

            Lockstep insulin price increases ............................................. 47

    C.    Pharmaceutical Payment and Supply Chain ................................ 47

ii

D.    The PBMs' Role in the Pharmaceutical Payment Chain ................. **48**

E.    The Insulin Pricing Scheme ................................................... **57**

F.    Defendants Admit that They Have Engaged in the Insulin Pricing Scheme and that It Is Harming Diabetics ...................................... **61**

G.    Defendants Profit from the Insulin Pricing Scheme ........................ **66**

H.    Plaintiff Purchases the At-Issue Drugs from Defendants ................. **74**

I.    Defendants Deceived Plaintiff ................................................ **74**

J.    The Insulin Pricing Scheme Damaged, and Continues to Damage, Plaintiff ............................................................................ **86**

K.    Defendants' Recent Efforts in Response to Rising Insulin Prices ....... **87**

V.    TOLLING OF THE STATUTES OF LIMITATIONS ........................... **89**

A.    Discovery Rule Tolling ........................................................ **89**

B.    Fraudulent Concealment Tolling ............................................. **90**

C.    Estoppel ........................................................................... **90**

D.    Continuing Violations ......................................................... **91**

VI.    CLAIMS FOR RELIEF ........................................................... **91**

Violations of the Racketeer Influenced and Corrupt Organizations Act ................. **91**

A.    Defendants Are Culpable "Persons" Under RICO ......................... **91**

B.    The Manufacturer-PBM RICO Enterprises ................................. **91**

C.    Defendants' Use of the U.S. Mails and Interstate Wire Facilities ........ **96**

D.    Conduct of the Manufacturer-PBM Enterprises' Affairs ................. **98**

E.    Defendants' Pattern of Racketeering Activity ............................. **100**

F.    Defendants' Motive ............................................................ **101**

G.    The Manufacturer-PBM Enterprises' Insulin Pricing Scheme ... **101**

Damaged Plaintiff ........................................................................ **101**

Violations of RICO, 18 U.S.C. § 1962(d) By Conspiring to Violate 18 U.S.C. § 1962(c) ................................................................................. **103**

iii

**Unjust Enrichment**................................................................................................... **105**

**Civil Conspiracy**...................................................................................................... **106**

**VII.     MOTION FOR INJUNCTION**....................................................................... **108**

**VIII.    PRAYER FOR RELIEF**................................................................................. **109**

**IX.      JURY DEMAND**............................................................................................ **110**

Plaintiff, St. Louis County, Missouri ("Plaintiff" or "St. Louis County"), by and through the undersigned attorneys, brings this lawsuit against the above-named Defendants and alleges as follows:

## I.    INTRODUCTION

1.    Diabetes is an epidemic and a public-health crisis throughout the United States. In 2021, 38.4 million people in the United States, or 11.6% of the population, had diabetes.[1] Of this number, over seven million people require daily insulin treatments to survive.[2]

2.    During the 1990s, insulin cost just $25 per vial in the U.S. By 2000, the price crept up to around $100. Between 2002 and 2013, insulin prices tripled, with a vial costing up to $350 or more. Insulin became the sixth most expensive liquid in the world.[3] The drastically increased price of insulin is not due to improvements in the drugs. It is the result of an "nsulin Pricing Scheme", an undisclosed conspiracy between insulin manufacturers, certain pharmacy benefit managers (PBMs), insurance companies and other payers.

3.    Approximately 537,000 million people in Missouri, or 11.2% of the adult population, have been diagnosed with diabetes.[4] Almost 1.6 million people in Missouri have prediabetes, meaning they have blood glucose levels higher than normal, but not yet high

---

[1] American Diabetes Association, *Statistics About Diabetes*, https://diabetes.org/about-diabetes/statistics/about-diabetes (last visited March 8, 2024).

[2] Mallory Locklear, *Insulin is an extreme financial burden for over 14% of Americans who use it*, https://news.yale.edu/2022/07/05/insulin-extreme-financial-burden-over-14-americans-who-use-it#:~:text=Search-,Insulin%20is%20an%20extreme%20financial%20burden%20for%20over%2014%25%20of,income%2C%20a%20new%20study%20finds.&text=Over%2030%20million%20Americans%20have,of%20them%20require%20daily%20insulin (last visited March 8, 2024).

[3] Alexi Melvin, *The 10 Most Expensive Liquids in the World*, https://beyondtype1.org/the-10-most-expensive-liquids-in-the-world/ (last visited March 8, 2024).

[4] Missouri Department of Social Services, *2023 Missouri Diabetes Report*, https://health.mo.gov/living/healthcondiseases/chronic/diabetes/pdf/missouri-diabetes-report.pdf (last visited March 8, 2024).

enough to be diagnosed as diabetic.[5]

4.      Diabetes is the leading cause of blindness, kidney failure, and lower limb amputations[6] and is the ninth leading cause of death in Missouri despite the availability of effective treatment.[7]

5.      The economic impact of diabetes is staggering. The total estimated cost of diabetes in the U.S. in 2022 was $412.9 billion, including $306.6 billion in direct medical costs and $106.3 billion in reduced productivity.  One in four healthcare dollars is spent caring for people with diabetes.[8]

6.      In Missouri, diabetes cost an estimated $4.9 billion per year in direct medical expenses in 2017. Indirect costs from lost productivity due to diabetes amount to an additional $1.8 billion.[9]

7.      Diabetics in Missouri generally rely on daily insulin treatments or the use of oral medications, insulin or a combination of both to treat and control diabetes. As a result, hundreds of thousands of Missouri residents must rely on the companies that manufacture at-issue drugs to stay alive.

8.      Defendants Eli Lilly, Novo Nordisk, and Sanofi (collectively, the "Manufacturer Defendants" or "Manufacturers") manufacture the vast majority of insulins and other diabetic

---

[5] American Diabetes Association, *The Burden of Diabetes in Missouri*, https://www2.diabetes.org/sites/default/files/2021-11/ADV_2021_State_Fact_sheets_MIssouri_rev.pdf (last visited March 8, 2024).
[6] Centers for Disease Control and Prevention, *What is Diabetes?* https://www.cdc.gov/diabetes/basics/diabetes.html (last visited March 8, 2024).
[7] *2023 Missouri Diabetes Report*, *supra* note 4.
[8] American Diabetes Association, *New American Diabetes Association Report Finds Annual Costs of Diabetwes to be $412.9 Billion*, https://diabetes.org/newsroom/press-releases/new-american-diabetes-association-report-finds-annual-costs-diabetes-be#:~:text=The%20Economic%20Report%2C%20which%20is,dollars%20spent%20in%20the%20U.S (last visited March 8, 2024).
[9] *The Burden of Diabetes in Missouri*, *supra* note 5.

2

medications available in the United States.

9.      Defendants CVS Caremark, Express Scripts, and OptumRx (collectively, the "PBM Defendants") are pharmacy benefit managers that collectively influence the pricing for the at-issue drugs.[10]

10.     The PBM Defendants' dominance results from the reality that these three corporate actors are: (1) the largest PBMs in the United States[11] (controlling approximately 80% of the PBM market); (2) the largest pharmacies in the United States (making up 3 of the top 5 dispensing pharmacies in the U.S.)[12]; and (3) housed within the same corporate families as three of the largest insurance companies in the United States—Aetna (CVS Caremark), Cigna (Express Scripts), and UnitedHealthcare (OptumRx). These Defendant corporate conglomerates sit at 5th (UnitedHealth Group), 6th (CVS Health), and 15th (Cigna) on the Fortune 500 list.[13]

11.     The PBM Defendants' dominance in insurance, pharmacy benefit managing, and pharmacy dispensing allows Defendants to profit in myriad ways from driving up the prices for the at-issue drugs.

12.     In fact, a recent study published in the Journal of the American Medical Association found that—for transactions where the PBM Defendants control the insurer, the PBM, and the pharmacy (e.g., Aetna-Caremark-CVS Pharmacy)— the PBM Defendants capture an astonishing

---

[10] The term "at-issue drugs" mean Humulin N, Humulin R, Humulin R 500, Humulin 70/30, Humalog, Trulicity, Basaglar, Lantus, Toujeo, Apidra, Soliqua, Novolin R, Novolin N, Novolin 70/30, Novolog, Levemir, Tresiba, Victoza, and Ozempic.

[11] Paige Twenter, *Top PBMs by 2022 market share*, https://www.beckershospitalreview.com/pharmacy/top-pbms-by-2022-market-share.html (last visited March 8, 2024).

[12] Paige Twenter, *15 biggest pharmacies by prescription revenue*, https://www.beckershospitalreview.com/pharmacy/15-biggest-pharmacies-by-prescription-revenue.html (last visited March 8, 2024).

[13] Molly Gamble, *Fortune 500's top 25 healthcare companies,* https://www.beckershospitalreview.com/rankings-and-ratings/fortune-500s-top-25-healthcare-companies-2023.html (last visited March 8, 2024).

3

50% of the money spent on each insulin prescription (up from only 25% in 2014), despite the fact that they do not contribute to the development, manufacture, innovation, or production of the drug.

13.     As part of this system, the PBM Defendants establish national formulary offerings (i.e., approved drug lists), which, among other things, set the baseline for which at-issue drugs are covered (and which are not covered) by nearly every payor in the United States, including in Missouri, and specifically, St. Louis County.

14.     The PBM Defendants know that their national formulary offerings drive drug utilization. The more accessible a drug is on the PBMs' national formulary, the more that drug will be used throughout the United States, including in St. Louis County.

15.     The Manufacturer Defendants likewise know that the PBM Defendants' national formularies drive drug utilization throughout the country.

16.     Given the PBM Defendants' market power and the crucial role their standard formularies play in the pharmaceutical pricing chain, both Defendant groups know that the PBM Defendants wield enormous control over drug prices and purchasing behavior.

17.     The unfair and deceptive conspiracy that forms the basis for this Complaint—the Insulin Pricing Scheme—resulted from this mutual understanding.

18.     Over the last fifteen years, pursuant to the Insulin Pricing Scheme, the Manufacturer Defendants sharply increased the reported prices of their insulin drugs in lockstep, all while the cost to produce these drugs actually decreased.

19.     In 1982, insulin was priced at $14 per vial.[14] In 2018, the average price of insulin per vial rose to $98.70.[15] Yet, it only cost the Manufacturer Defendants roughly $2 to $4 to produce

---

[14] Irl B. Hirsch, *Insulin in America: A Right or a Privilege?*
https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5001219/#:~:text=Through%20the%20years%2C%20insulin%20remained,seem%20to%20be%20a%20concern (last visited March 8, 2024).
[15] Doug Irving, *The Astronomical Price of Insulin Hurts American Families,*

4

a vial of insulin in 2018.[16]

20.     In the last decade alone, the Manufacturer Defendants have, in tandem, increased the prices of their insulins up to 1000%. Notably, the Manufacturer Defendants increased their prices by the same amounts, down to the decimal point, within a few days of one another.[17]

21.     For example, Humalog and NovoLog increased their prices by nearly identical amounts at nearly identical times:[18]

---

https://www.rand.org/pubs/articles/2021/the-astronomical-price-of-insulin-hurts-american-families.html (last visited March 8, 2024).
[16] Arthur Allen, *Insulin's high cost goes beyond drugmakers to industry's price mediators*, https://www.cnn.com/2023/03/09/health/insulin-cost-khn-partner/index.html (last visited March 8, 2024).
[17] Benjamin Scott Savard, *Insulin Makers' Profit Seeking Will Keep Killing Diabetics*, https://jacobin.com/2023/03/insulin-drugmakers-profit-diabetes-big-pharma-eli-lilly (last visited March 8, 2024).
[18] Carolyn V. Johnson, *After years of price hikes Eli Lilly announces a discount on insulin,* https://www.washingtonpost.com/news/wonk/wp/2016/12/13/after-years-of-price-hikes-eli-lilly-announces-a-discount-on-insulin/ (last visited March 8, 2024).

## Insulin prices rising in lock-step

Humalog and NovoLog, both rapid-acting analog insulins, have increased their prices by nearly identical amounts at nearly identical times. Prices for Humalog have increased nearly 700% since 1996 when adjusted for inflation.



Notes: List price is in unadjusted dollars and does not reflect rebates or discounts

Source: Truven Health Analytics                    THE WASHINGTON POST

22.     Despite the steady and steep price increases, nothing about these medications has changed during the relevant period. Today's $360 insulin is the exact same product Defendants once sold for $21.[19]

23.     The current exorbitant price of insulin stands in stark contrast to its origins: the discoverers sold the original patent for $1 to ensure that the medication would remain affordable.[20] Today, insulin has become the poster child for skyrocketing pharmaceutical prices.

24.     Both the Manufacturer Defendants and the PBM Defendants play vital roles in, and profit immensely from, the Insulin Pricing Scheme.

25.     The Insulin Pricing Scheme works as follows: first, to gain formulary access from

---

[19] Ritu Prasad, *The human cost of insulin in America*, https://www.bbc.com/news/world-us-canada-47491964 (last visited March 8, 2024).
[20] *Insulin in America: A Right or a Privilege, supra* note 14.

the PBM Defendants for their diabetic treatments, the Manufacturer Defendants artificially and willingly raise their prices, and then secretly pay a significant, yet undisclosed, portion of that false list price back to the PBM Defendants. These Manufacturer Payments[21] may be characterized as rebates, discounts, credits, inflation/price protection fees, administration fees, etc. However they are described, the Manufacturer Payments, along with the inflated reported prices, are a *quid pro quo* for inclusion in the PBM Defendants' national formularies.

26.     The Manufacturer Defendants' list prices are so untethered from the net prices realized by the Manufacturers as to constitute a false, artificially inflated, price.

27.     Next, the PBM Defendants grant national formulary status based upon the highest inflated price—which the PBM Defendants know to be false—and upon which at-issue drugs generate the largest profits for them.

28.     The Insulin Pricing Scheme creates a win/win scenario for Defendants. The Manufacturer Defendants are able to buy preferred formulary position and increase their revenues, while the PBM Defendants benefit from secret Manufacturer Payments.

29.     The PBM Defendants profit from the Insulin Pricing Scheme in numerous ways, including: (1) retaining a significant—and undisclosed—percentage of the secret Manufacturer Payments, either directly or through rebate aggregators; (2) using the prices created by the Insulin Pricing Scheme to generate unearned and unwarranted profits from pharmacies; and (3) relying on those same artificial prices to drive up the PBM Defendants' margins and fees related to their mail-order pharmacies.

---

[21] The term "Manufacturer Payments" is defined as all payments or financial benefits of any kind conferred by Manufacturer Defendants to PBM Defendants (or a subsidiary, affiliated entity, or group purchasing organization or rebate aggregator acting on a PBM's behalf), either directly via contract or indirectly via Manufacturer-controlled intermediaries. Manufacturer Payments includes rebates, administrative fees, inflation fees, pharmacy supplemental discounts, volume discounts, price or margin guarantees and any other form of consideration exchanged.

30.     Thus, although the PBM Defendants represent both publicly and to their clients that they use their market power to negotiate lower prices for at-issue drugs, these representations are false and deceptive. Instead, the PBM Defendants' "negotiations" intentionally drive up the price of the at-issue drugs and are directly responsible for the skyrocketing price of at-issue drugs.

31.     Because the price of every at-issue insulin medication is based upon the price generated by Defendants' unfair and deceptive scheme, every payor that purchases these life-sustaining drugs, including Plaintiff, has been directly harmed by the Insulin Pricing Scheme.

32.     For diabetes patients in Missouri, including the employees, retirees, and their dependents to whom Plaintiff provides health benefits (the "Beneficiaries" of Plaintiff's health plans), the physical, emotional, and financial tolls of paying excessive prices for at-issue drugs is devastating. Unable to afford the drugs their doctors prescribe, many diabetics are forced to ration or under-dose their insulin, inject expired insulin, reuse needles, and starve themselves to control their blood sugars with as little insulin as possible. These behaviors are extremely dangerous and can lead to serious complications or even death.

33.     As a payor for and purchaser of the at-issue drugs, Plaintiff has been overcharged millions of dollars during the relevant time period as a direct result of the Insulin Pricing Scheme.

34.     Indeed, since 2014, Plaintiff has spent almost $12 million on the at-issue drugs.

35.     A substantial portion of that amount is attributable to the Insulin Pricing Scheme, not transparent or competitive market forces.

36.     Defendants' participation in the Insulin Pricing Scheme violated the Racketeer Influenced and Corrupt Organizations Act and Missouri common law by engaging in the Insulin Pricing Scheme, and directly and foreseeably caused and continues to cause harm to Plaintiff.

37.     Plaintiff seeks legal relief against the Defendants to protect its economic interests and to protect its Beneficiaries. This action seeks injunctive relief, restitution, disgorgement, actual

8

damages, treble damages, punitive damages, and attorneys' fees and costs to address and abate the harm caused by the Insulin Pricing Scheme.

38.     The relevant period for damages alleged in this Complaint is from 2003 through the present.

## II.     PARTIES

### A.     Plaintiff

39.     **Plaintiff St. Louis County, Missouri** is a body corporate and politic under the laws of the State of Missouri.

40.     Plaintiff, as a government entity, provides vital services to approximately one million residents including public safety, emergency management, and health services.

41.     Any increase in spending has a detrimental effect on Plaintiff's overall budget and, in turn, negatively impacts its ability to provide necessary services to the community. The Insulin Pricing Scheme has had such an effect.

42.     Additionally, as a government employer, Plaintiff provides health benefits to its Beneficiaries. One of the benefits Plaintiff offers its Beneficiaries is paying a substantial portion of the purchase price of their pharmaceutical drugs, including the at-issue drugs.

43.     Plaintiff maintains a self-insured health plan for its Beneficiaries, with approximately 7,036 members.

44.     Plaintiff spends over $1 million per year on the costs of providing at-issue drugs for its Beneficiaries. Accordingly, over the course of the relevant time period, Plaintiff has expended millions of dollars in overcharges to the detriment of its Beneficiaries and taxpayers.

### B.     Manufacturer Defendants

45.     **Defendant Eli Lilly and Company ("Eli Lilly")** is an Indiana corporation with its principal place of business at Lilly Corporate Center, Indianapolis, Indiana 46285.

46.     In Missouri and nationally, Eli Lilly manufactures, promotes, and distributes several at-issue drugs: Humulin N, Humulin R, Humulin R 500, Humulin 70/30, Humalog, Trulicity, and Basaglar.

47.     Eli Lilly's U.S. revenues in 2022 were $5.69 billion from Trulicity, $1.19 billion from Humalog, $730 million from Humulin and $470.7 million from Basaglar.[22]

48.     Eli Lilly transacts business in Missouri and in St. Louis County, targeting these markets for its products, including the at-issue drugs.

49.     Eli Lilly employs sales representatives throughout Missouri to promote and sell Humulin N, Humulin R, Humulin R 500, Humulin 70/30, Humalog, Trulicity, and Basaglar.

50.     Eli Lilly also directs advertising and informational materials to Missouri, including St. Louis County physicians and potential users of Eli Lilly's products.

51.     During the relevant time period, in furtherance of the Insulin Pricing Scheme, Eli Lilly published its prices for the at-issue drugs throughout Missouri with the express knowledge that Plaintiff's payment and reimbursement would be based on those false list prices.

52.     During the relevant time period, Plaintiff purchased Eli Lilly's at-issue drugs at a price based on false list prices generated by the Insulin Pricing Scheme through its employee health plans and for use in county-run facilities.

53.     All of the Eli Lilly at-issue drugs related to the at-issue transactions were paid for and/or reimbursed in Missouri based on the specific false and inflated prices Eli Lilly caused to be published in Missouri in furtherance of the Insulin Pricing Scheme.

54.     **Defendant Sanofi-Aventis U.S. LLC ("Sanofi")** is a Delaware limited liability company with its principal place of business at 55 Corporate Drive, Bridgewater, New Jersey 08807.

---

[22] Eli Lilly 2022 Form 10-K.

55.     Sanofi manufactures, promotes, and distributes pharmaceutical drugs both in Missouri and nationally, including several at-issue drugs: Lantus, Toujeo, Soliqua, and Apidra.

56.     Sanofi's U.S. revenues in 2022 were €757 million (approximately $794.85 million) from Lantus, €283 million from Toujeo (approximately $297.15 million), and €119 million (approximately $124.95 million) from Soliqua.[23]

57.     Sanofi transacts business in Missouri and in St. Louis County, targeting these markets for its products, including the at-issue drugs.

58.     Sanofi employs sales representatives throughout Missouri and in this District to promote and sell Lantus, Toujeo, Soliqua, and Apidra.

59.     Sanofi also directs advertising and informational materials to Missouri physicians and potential users of Sanofi's products for the specific purpose of selling the at-issue drugs in Missouri and St. Louis County and profiting from the Insulin Pricing Scheme.

60.     During the relevant time period, in furtherance of the Insulin Pricing Scheme, Sanofi published its prices of its at-issue drugs throughout Missouri for the purpose of payment and reimbursement by payors, including Plaintiff.

61.     During the relevant time period, Plaintiff purchased Sanofi's at-issue drugs at prices based on false list prices generated by the Insulin Pricing Scheme through its employee health plans and for use in county-run facilities.

62.     All of the Sanofi at-issue drugs related to the at-issue transactions were paid for and/or reimbursed in Missouri and St. Louis County based on the specific false and inflated prices Sanofi caused to be published in Missouri in furtherance of the Insulin Pricing Scheme.

63.     **Defendant Novo Nordisk Inc. ("Novo Nordisk")** is a Delaware corporation with

---

[23] Sanofi, 2022 Form 20-F. Approximate dollar values are based on the average Euro to U.S. dollar exchange rate in 2022, 1 Euro = 1.05 U.S. dollars.

its principal place of business at 800 Scudders Mill Road, Plainsboro, New Jersey 08536.

64.     Novo Nordisk manufactures, promotes, and distributes pharmaceutical drugs both in Missouri and nationally, including at-issue diabetic medications: Novolin R, Novolin N, Novolin 70/30, Novolog, Levemir, Tresiba, Victoza, and Ozempic.

65.     Novo Nordisk's global revenues in 2021 were $2.53 billion from Novolog, $903 million from Levemir, $1.547 billion from Tresiba, $2.39 billion from Victoza and $5.359 billion from Ozempic.[24]

66.     Novo Nordisk transacts business in Missouri and in St. Louis County, targeting these markets for its products, including the at-issue drugs.

67.     Novo Nordisk employs sales representatives throughout Missouri and St. Louis County to promote and sell Novolin R, Novolin N, Novolin 70/30, Novolog, Levemir, Tresiba, Victoza, and Ozempic.

68.     Novo Nordisk also directs advertising and informational materials to Missouri and St. Louis County physicians and potential users of Novo Nordisk's products.

69.     During the relevant time period, in furtherance of the Insulin Pricing Scheme, Novo Nordisk published its prices of its at-issue drugs throughout Missouri for the purpose of payment and reimbursement by Plaintiff.

70.     During the relevant time period, Plaintiff purchased Novo Nordisk's at-issue drugs at prices based on false list prices generated by the Insulin Pricing Scheme through its employee health plans and for use in county-run facilities.

71.     All of the Novo Nordisk at-issue drugs related to the at-issue transactions were paid for and/or reimbursed in Missouri based on the specific false and inflated prices Novo Nordisk

[24] Christiane Truelove, *Novo Nordisk 2022: Expanding Capabilities*, https://www.pharmalive.com/novo-nordisk-2022-expanding-capabilities/ (last visited March 8, 2024).

caused to be published in Missouri in furtherance of the  Insulin Pricing Scheme.

72.     Collectively, Defendants Eli Lilly, Novo Nordisk, and Sanofi are referred to as the "Manufacturer Defendants" or the "Manufacturers."

### C.     PBM Defendants

### CVS Caremark

73.     **Defendant CVS Health Corporation ("CVS Health")** is a Delaware corporation with its principal place of business at One CVS Drive, Woonsocket, Rhode Island 02895. CVS Health transacts business and has locations throughout the United States and Missouri.

74.     CVS Health—through its executives and employees, including its CEO, Chief Medical Officer, Executive Vice Presidents, Senior Executives in Trade Finance, Senior Vice Presidents, and Chief Communication Officers—is directly involved in creating and implementing the company policies that inform its PBM services and formulary construction, including with respect to the at-issue drugs involved in the Insulin Pricing Scheme.

75.     CVS Health's conduct had a direct effect in Missouri and damaged Plaintiff as a payor and purchaser.

76.     On a regular basis, CVS Health executives and employees communicate with and direct its subsidiaries related to the at-issue PBM services and formulary activities.

77.     CVS Health (or its predecessor) has repeatedly and explicitly stated that *CVS Health*:[25]

•      designs pharmacy benefit plans that minimize the costs to the client while prioritizing the welfare and safety of the clients' members;

•      negotiates with pharmaceutical companies to obtain discounted acquisition costs for many of the products on CVS Health's drug lists, and these negotiated discounts enable CVS Health to offer reduced costs to clients;

•      utilizes an independent panel of doctors, pharmacists, and other medical experts,

---

[25] CVS Caremark/CVS Health, Annual Reports (Forms 10-K) (Dec. 31, 2009-2019).

referred to as its Pharmacy and Therapeutics Committee, to select drugs that meet the highest standards of safety and efficacy for inclusion on its drug lists.

78.     CVS Health publicly represents that CVS Health constructs programs that lower the cost of the at-issue drugs. For example, in 2016, CVS Health announced a new program to "reduce overall spending in diabetes" that is available in all states, including Missouri, stating:

"CVS Health today introduced Transform Diabetes Care, a new program available to help the company's pharmacy benefit management (PBM) clients to improve the health outcomes of their members, *lower pharmacy costs [for diabetes medications]* through aggressive trend management and decrease medical costs . . . [and that] participating clients could save between $3000 to $5000 per year for each member who successfully improves control of their diabetes" (emphasis supplied).[26]

79.     In 2017, CVS Health stated that "CVS Caremark has been able to help…keep drug cost inflation under control in spite of steady price increases by manufacturers. In 2017, drug price growth for PBM clients was only 0.2 percent, despite manufacturer price increases of nearly 10%."[27]

80.     In November 2018, CVS Health acquired Aetna for $69 billion and became the first combination of a major health insurer, PBM, and mail-order and retail pharmacy chain. As a result, CVS Health controls the health plan/insurer, the PBM and the pharmacies utilized by approximately 40 million Aetna members in the United States and in Missouri. CVS Health controls the entire drug pricing chain for these 40 million Americans.

81.     CVS Health is the immediate or indirect parent of many pharmacy subsidiaries that own and operate hundreds of pharmacies throughout Missouri that dispensed and received payment for the at-issue drugs throughout the relevant time period.

---

[26] CVS HEALTH, *https://www.prnewswire.com/news-releases/cvs-health-introduces-new-transform-diabetes-care-program-to-improve-health-outcomes-and-lower-overall-health-care-costs-300377101.html,* (last visited March 8, 2024)..

[27] CVS HEALTH, *Current and New Approaches to Making Drugs More Affordable,*https://www.cvshealth.com/content/dam/enterprise/cvs-enterprise/pdfs/ingestion/cvs-health-current-and-new-approaches-to-making-drugs-more-affordable.pdf (last visited March 8, 2024).

82.     **Defendant CVS Pharmacy, Inc. ("CVS Pharmacy")** is a Rhode Island corporation whose principal place of business is at the same location as CVS Health. CVS Pharmacy is a wholly owned subsidiary of CVS Health.

83.     CVS Pharmacy is the immediate or indirect parent of many pharmacy subsidiaries that own and operate hundreds of pharmacies throughout Missouri and is directly involved in these pharmacies dispensing and payment policies related to the at- issue at-issue drugs.

84.     CVS Pharmacy is also the immediate and direct parent of Defendant Caremark Rx, LLC.

85.     During the relevant time period, CVS Pharmacy provided retail pharmacy services in Missouri that gave rise to the Insulin Pricing Scheme, which damaged Plaintiff.

86.     **Defendant Caremark Rx, LLC** is a Delaware limited liability company and an immediate or indirect parent of many subsidiaries, including pharmacy benefit management and mail order subsidiaries that engaged in the activities in Missouri that gave rise to this Complaint.

87.     Caremark Rx, LLC is a wholly owned subsidiary of Defendant CVS Pharmacy with its principal place of business at the same location as CVS Pharmacy and CVS Health.

88.     During the relevant time period, Caremark Rx, LLC provided PBM and mail order pharmacy services in Missouri that gave rise to the Insulin Pricing Scheme and damaged payors in Missouri.

89.     **Defendant Caremark LLC** is a California limited liability company whose principal place of business is at the same location as CVS Health. Caremark, LLC is a wholly owned subsidiary of Caremark Rx, LLC

90.     During the relevant time period, Caremark, LLC provided PBM and mail order pharmacy services in Missouri and St. Louis County that gave rise to the Insulin Pricing Scheme, which damaged Plaintiff.

91.    **Defendant CaremarkPCS Health, LLC** is a Delaware limited liability company whose principal place of business is at the same location as CVS Health. CVS Health is the direct or indirect parent company of CaremarkPCS Health LLC.

92.    CaremarkPCS Health, LLC, doing business as CVS Caremark, provides pharmacy benefit management services.

93.    During the relevant time period, CaremarkPCS Health, LLC provided PBM services in Missouri, which gave rise to the Insulin Pricing Scheme and damaged Plaintiff.

94.    Defendants CaremarkPCS Health, LLC and Caremark, LLC are agents and/or alter egos of Caremark Rx, LLC, CVS Pharmacy, and CVS Health.

95.    As a result of numerous interlocking directorships and shared executives, Caremark Rx, LLC, CVS Pharmacy and CVS Health are directly involved in the conduct of and control CaremarkPCS Health, LLC and Caremark, LLC's operations, management and business decisions related to the at-issue formulary construction, Manufacturer Payments and mail order and retail pharmacy services to the ultimate detriment of Plaintiff.

96.    CVS Health owns all the stock of CVS Pharmacy, which owns all the stock of Caremark Rx, LLC, which owns all the stock of Caremark LLC. CVS Health also directly or indirectly owns all the stock of CaremarkPCS Health LLC.

97.    CVS Health, as a corporate family, does not operate as separate entities. The public filings, documents and statements of CVS Health presents its subsidiaries, including CVS Pharmacy, CaremarkPCS Health, LLC, Caremark, LLC and Caremark Rx, LLC as divisions or departments of one unified "diversified health services company" that "works together across our disciplines" to "create unmatched human connections to transform the health care experience." The day-to-day operations of this corporate family reflect these public statements. These entities are a single business enterprise and should be treated as such as to all legal obligations discussed

16

in this Complaint.

98.     All executives of CaremarkPCS Health, LLC, Caremark, LLC, Caremark Rx, LLC, and CVS Pharmacy ultimately report to the executives at CVS Health, including the President and CEO of CVS Health.

99.     As stated above, CVS Health's CEO, Chief Medical Officer, Executive Vice Presidents, Senior Executives in Trade Finance, Senior Vice Presidents and Chief Communication Officers are directly involved in the policies and business decisions of CaremarkPCS Health, LLC and Caremark, LLC that gave rise to Plaintiff's claims in this Complaint.

100.    Collectively, Defendants CVS Health, CVS Pharmacy, Caremark Rx, LLC, Caremark, LLC and CaremarkPCS Health, LLC, including all predecessor and successor entities, are referred to as "CVS Caremark."

101.    CVS Caremark is named as a Defendant in its capacities as a PBM and pharmacy.

102.    In its capacity as a PBM, CVS Caremark coordinates with Novo Nordisk, Eli Lilly, and Sanofi regarding the price of the at-issue drugs, as well as for the placement of these firms' at-issue drugs on CVS Caremark's formularies.

103.    CVS Caremark has the largest PBM market share based on total prescription claims managed, representing approximately 33% of the national market.[28] CVS Caremark's pharmacy services segment generated $169.2 billion in total revenues in 2022.[29]

104.    During the relevant time period, CVS Caremark offered pharmacy benefit services nationwide and to Missouri payors, and derived substantial revenue therefrom, and, in doing so, made the at-issue misrepresentations (discussed below) and utilized the artificially inflated prices

---

[28] Paige Twenter, *Top PBMs by 2022 market share,*
https://www.beckershospitalreview.com/pharmacy/top-pbms-by-2022-market-share.html (last visited March 8, 2024).
[29] CVS Caremark Annual Report (Form 10-K) (Dec. 31, 2022).

generated by the Insulin Pricing Scheme to profit off payors.

105.    During the relevant time period, CVS Caremark offered pharmacy benefit management services nationwide and maintained standard formularies that are used nationwide, including in Missouri. During the relevant time period, those formularies included all of the at-issue drugs.

106.    CVS Caremark purchases drugs directly from manufacturers and through drug wholesalers for dispensing through its mail order pharmacy.

107.    In its capacity as a retail pharmacy, CVS Caremark knowingly profited from the false list prices produced by the Insulin Pricing Scheme by pocketing the spread between acquisition cost for the drugs at issue (an amount well below the list price generated by the Insulin Pricing Scheme), and the amounts it received from payors (which were based on the false list prices and, in many cases, were set by CVS Caremark in its capacity as a PBM).

108.    During the relevant time period, CVS Caremark had express agreements with Defendants Novo Nordisk, Sanofi, and Eli Lilly related to the Manufacturer Payments paid by the Manufacturer Defendants to CVS Caremark, as well as agreements related to the Manufacturers' at-issue drugs sold through CVS Caremark's mail order pharmacies.

<div align="center"><strong>Express Scripts</strong></div>

109.    **Defendant Evernorth Health, Inc. ("Evernorth"),** formerly known as Express Scripts Holding Company, is a Delaware corporation with its principal place of business at 1 Express Way, St. Louis, Missouri 63121.

110.    Evernorth, through its executives and employees, including its CEO and Vice Presidents, is directly involved in shaping the company policies that inform its PBM services and formulary construction, including with respect to the at-issue drugs, related to the Insulin Pricing Scheme.

<div align="center">18</div>

111.    Evernorth's conduct had a direct effect in Missouri and to Plaintiff.

112.    On a regular basis, Evernorth executives and employees communicate with and direct its subsidiaries related to the at-issue PBM services and formulary activities.

113.    Evernorth is the immediate or indirect parent of pharmacy and PBM subsidiaries that operate throughout Missouri, which engaged in the activities that gave rise to this Complaint.

114.    In December 2018, Evernorth merged with Cigna in a $67 billion deal to consolidate their businesses as a major health insurer, PBM, and mail-order pharmacy. As a result, the Evernorth corporate family controls the health plan/insurer, the PBM, and the mail-order pharmacies utilized by approximately 15 million Cigna members in the United States and in Missouri. Evernorth controls the entire drug pricing chain for these 15 million Americans.

115.    In annual reports over the last decade, Evernorth has repeatedly and explicitly[30]:

•       Acknowledged that it is directly involved in the company's PBM services, stating "[Evernorth is] the largest stand-alone PBM company in the United States."

•       Stated that Evernorth: "provid[es] products and solutions that focus on improving patient outcomes and assist in controlling costs; evaluat[es] drugs for efficacy, value and price to assist clients in selecting a cost-effective formulary; [and] offer[s] cost-effective home delivery pharmacy and specialty services that result in cost savings for plan sponsors and better care for members."

116.    **Defendant Express Scripts, Inc.** is a Delaware corporation and is a wholly owned subsidiary of Defendant Evernorth. Express Scripts, Inc.'s principal place of business is at the same location as Evernorth.

117.    Express Scripts, Inc. is the immediate or indirect parent of pharmacy and PBM subsidiaries that operate throughout Missouri that engaged in the conduct, which gave rise to this Complaint.

118.    During the relevant time period, Express Scripts Inc. was directly involved in the

---

[30] Express Scripts Annual Reports 2009-2019.

PBM and mail-order pharmacy services, which gave rise to the Insulin Pricing Scheme and damaged Plaintiff.

119.    Indeed, Express Scripts, Inc. provides pharmacy benefit services to Plaintiff, based on Plaintiff's reliance upon Express Scripts, Inc.'s response to the County Request for Proposals.

120.    **Defendant Express Scripts Administrators, LLC,** doing business as Express Scripts and formerly known as Medco Health, LLC, is a Delaware limited liability company and is a wholly owned subsidiary of Evernorth. Express Scripts Administrators, LLC's principal place of business is at the same location as Evernorth.

121.    During the relevant time period, Express Scripts Administrators, LLC provided the PBM services in Missouri discussed in this Complaint that gave rise to the Insulin Pricing Scheme that damaged Plaintiff.

122.    **Defendant ESI Mail Pharmacy Service, Inc.** is a Delaware corporation and is a wholly owned subsidiary of Defendant Evernorth. ESI Mail Pharmacy Service, Inc.'s principal place of business is at the same location as Evernorth.

123.    During the relevant time period, ESI Mail Pharmacy Services provided the mail-order pharmacy services in Missouri discussed in this Complaint, which gave rise to the Insulin Pricing Scheme and damaged Plaintiff.

124.    **Defendant Express Scripts Pharmacy, Inc.** is a Delaware corporation and is a wholly owned subsidiary of Defendant Evernorth. Express Scripts Pharmacy, Inc.'s principal place of business is at the same location as Evernorth.

125.    During the relevant time period, Express Scripts Pharmacy, Inc. provided the mail order pharmacy services in Missouri discussed in this Complaint, which gave rise to the Insulin Pricing Scheme and damaged Plaintiff.

126.    As a result of numerous interlocking directorships and shared executives, Evernorth

and Express Scripts, Inc. control Express Scripts Administrators, LLC, ESI Mail Pharmacy Service, Inc., Medco Health Solutions, Inc., and Express Scripts Pharmacy, Inc's operations, management, and business decisions related to the at-issue formulary construction, negotiations, and mail order pharmacy services to the ultimate detriment of Plaintiff.

127.    Evernorth directly or indirectly owns all the stock of Express Scripts Administrators, LLC, Medco Health Solutions, Inc., ESI Mail Pharmacy Service, Inc., Express Scripts Pharmacy, Inc. and Express Scripts, Inc.

128.    The Evernorth corporate family does not operate as separate entities.

129.    The public filings, documents and statements of Evernorth present its subsidiaries, including Express Scripts Administrators, LLC, ESI Mail Pharmacy Service, Inc., Express Scripts Pharmacy, Inc. and Express Scripts, Inc. as divisions or departments of a single company that "unites businesses that have as many as 30+ years of experience . . . [to] tak[e] health services further with integrated data and analytics that help us deliver better care to more people."[31] The day-to-day operations of this corporate family reflect these public statements. All of these entities are a single business enterprise and should be treated as such as to all legal obligations detailed in this Complaint.

130.    All of the executives of Express Scripts Administrators, LLC, ESI Mail Pharmacy Service, Inc., Express Scripts Pharmacy, Inc. and Express Scripts, Inc. ultimately report to the executives, including the CEO, of Evernorth.

131.    As stated above, Evernorth's CEO and other executives and officers are directly involved in the policies and business decisions of Express Scripts Administrators, LLC, ESI Mail Pharmacy Service, Inc., Express Scripts Pharmacy, Inc. and Express Scripts, Inc. that gave rise to Plaintiff's claims in this Complaint.

---

[31] Evernorth, https://www.evernorth.com/our-solutions (last visited March 8, 2024).

132.     Collectively, Defendants Evernorth Health, Inc., Express Scripts, Inc., Express Scripts Administrators, LLC, ESI Mail Pharmacy Service, Inc., and Express Scripts Pharmacy, Inc., including all predecessor and successor entities, are referred to as "Express Scripts."

133.     Express Scripts is named as a Defendant in its capacities as a PBM and mail-order pharmacy.

134.     In its capacity as a PBM, Express Scripts coordinates with Novo Nordisk, Eli Lilly, and Sanofi regarding the price of the at-issue drugs, as well as for the placement of these firms' at-issue drugs on Express Script's formularies.

135.     Prior to merging with Cigna in 2019, Express Scripts was the largest independent PBM in the United States.  During the relevant period of this Complaint, Express Scripts controlled 30% of the PBM market in the United States. Express Scripts has only grown larger since the Cigna merger.

136.     In 2017, annual revenue for Express Scripts was over $100 billion.[32]

137.     As of December 31, 2022, more than 67,000 retail pharmacies, representing over 98% of all retail pharmacies in the nation, participated in one or more of Express Scripts' networks.[33]

138.     Express Scripts transacts business throughout the United States and Missouri.

139.     During the relevant time period, Express Scripts derived substantial revenue providing pharmacy benefits in Missouri.

140.     During the relevant time period, and contrary to all of their express representations, Express Scripts knowingly insisted that its payor clients use the false list prices produced by the Insulin Pricing Scheme as the basis for reimbursement of the at- issue drugs.

---

[32] Express Scripts, Annual Report (Form 10-K) (Dec. 31, 2018).
[33] The Cigna Group, Form 10-K (Dec. 31, 2022).

141.     During the relevant time period, Express Scripts has concealed its critical role in the generation of those false list prices.

142.     During the relevant time period, Express Scripts maintained standard formularies that are used nationwide, including in Missouri. During the relevant time period, those formularies included drugs produced by the Manufacturer Defendants, including the at-issue drugs.

143.     During the relevant time period, Express Scripts provided PBM services to Plaintiff and, in doing so, Express Scripts set the price that Plaintiff paid for the at-issue drugs at prices based on the false list prices generated by the Insulin Pricing Scheme and Plaintiff paid Express Scripts for the at-issue drugs.

144.     In its capacity as a mail-order pharmacy, Express Scripts received payments from Missouri payors for, and set the out-of-pocket price paid for, the at-issue drugs based on the falsely inflated prices produced by the Insulin Pricing Scheme and, as a result, damaged Plaintiff.

145.     During the relevant time period, Express Scripts offered pharmacy benefit management services nationwide and maintained standard formularies that are used nationwide, including in Missouri. During the relevant time period, those formularies included at-issue drugs, including all of those at issue in this Complaint.

146.     Express Scripts purchases drugs directly from manufacturers for dispensing through its mail-order pharmacy.

147.     During the relevant time period, Express Scripts dispensed the at-issue medications nationwide and directly to Plaintiff through its mail order pharmacies and derived substantial revenue from these activities in Missouri.

148.     During the relevant time period, in addition to its critical role in the Insulin Pricing Scheme, which detrimentally affected all payors and purchasers of the at-issue drugs, Express Scripts also provided PBM services directly to Plaintiff.

23

149.     During certain years when some of the largest at-issue price increases occurred, including in 2013 and 2014, Express Scripts worked directly with OptumRx to negotiate Manufacturer Payments on behalf of OptumRx and its clients in exchange for preferred formulary placement.[34]

150.     During the relevant time period, Express Scripts had express agreements with Defendants Novo Nordisk, Sanofi and Eli Lilly related to the Manufacturer Payments paid by the Manufacturer Defendants to Express Scripts, as well as agreements related to the Manufacturers' at-issue drugs sold through Express Scripts' mail-order pharmacies.

**Optum Rx**

151.     **Defendant UnitedHealth Group, Inc**. is a corporation organized under the laws of Delaware with its principal place of business at 9900 Bren Road East, Minnetonka, Minnesota, 55343.

152.     UnitedHealth Group, Inc. is a diversified managed healthcare company. In 2023, UnitedHealth Group reported revenue in excess of $371.6 billion[35], and the company is currently ranked sixth on the Fortune 500 list. UnitedHealth Group, Inc. offers a spectrum of products and services including health insurance plans through its wholly owned subsidiaries and prescription drugs through its PBM, OptumRx.

153.     Over one-third of the overall revenues of UnitedHealth Group come from OptumRx.[36]

---

[34] Charles E. Grassley & Ron Wyden, *Insulin: Examining The Factors Driving The Rising Cost Of A Century Old Drug, S. Fin. Comm.,* https://www.finance.senate.gov/imo/media/doc/Insulin%20Committee%20Print.pdf (last visited March 8, 2024) ("January 2021 Senate Insulin Report").
[35] United Health Group, UnitedHealthGroup Reports 2023 Results, https://www.unitedhealthgroup.com/content/dam/UHG/PDF/investors/2023/UNH-Q4-2023-Release.pdf (last visited March 8, 2024).
[36] *Id.*

154.    UnitedHealth Group, through its executives and employees, is directly involved in the company policies that inform its PBM services and formulary construction, including with respect to the at-issue drugs and related to the Insulin Pricing Scheme. For example, UnitedHealth Group executives structure, analyze, and direct the company's overarching policies, including with respect to PBM and mail-order services, as a means of maximizing profitability across the corporate family.

155.    In addition to being a PBM and a mail-order pharmacy, UnitedHealth Group owns and controls a major health insurance company, UnitedHealthcare. As a result, UnitedHealth Group controls the health plan/insurer, the PBM and the mail-order pharmacies utilized by approximately 26 million UnitedHealthcare members in the United States and in Missouri. UnitedHealth Group controls the entire drug pricing chain for these 26 million Americans.

156.    UnitedHealth Group's conduct had a direct effect in Missouri and damaged Plaintiff.

157.    UnitedHealth Group states in its Annual Reports that UnitedHealth Group "utilizes Optum's capabilities to help coordinate and provide patient care, improve affordability of medical care, analyze cost trends, manage pharmacy care services, work with care providers more effectively and create a simpler and more satisfying consumer and physician experience."[37]

158.    **Defendant Optum, Inc.,** is a Delaware corporation with its principal place of business located in Eden Prairie, Minnesota. Optum, Inc. is a health services company managing subsidiaries that administer pharmacy benefits, including Defendant OptumRx, Inc.

159.    Optum, Inc. is directly involved, through its executives and employees, in the company policies that inform its PBM services and formulary construction, including with respect to the at-issue drugs and related to the Insulin Pricing Scheme, which had a direct effect in Missouri and damaged Plaintiff.

---

[37] UnitedHealth Group, Annual Report (Form 10-K) (Dec. 31, 2022).

160.    For example, according to Optum Inc.'s press releases, Optum, Inc. is "UnitedHealth Group's information and technology-enabled health services business platform serving the broad healthcare marketplace, including care providers, plan sponsors, payors, life sciences companies and consumers."[38] In this role Optum, Inc. is directly responsible for the "business units – OptumInsight, OptumHealth and OptumRx"[39] and the CEOs of all these companies report directly to Optum, Inc. regarding their policies, including those that inform the at-issue formulary construction and mail order activities.

161.    **Defendant OptumRx, Inc.** is a California corporation with its principal place of business at 2300 Main Street, Irvine, California, 92614.

162.    OptumRx, Inc. operates as a subsidiary of OptumRx Holdings, LLC, which in turn operates as a subsidiary of Defendant Optum, Inc.

163.    During the relevant time period, OptumRx, Inc. provided the PBM and mail order pharmacy services in Missouri that gave rise to the Insulin Pricing Scheme, which damaged Plaintiff.

164.    **Defendant OptumInsight, Inc.** is a Delaware corporation with its principal place of business located in Eden Prairie, Minnesota.

165.    OptumInsight, Inc. is an integral part of the Insulin Pricing Scheme and, during the relevant time period OptumInsight coordinated directly with the Manufacturer Defendants in furtherance of the conspiracy. OptumInsight analyzed data and other information from the Manufacturer Defendants to advise the other Defendants with regard to the profitability of the

---

[38] UNITEDHEALTH GROUP, *United Health Group Announces 'Optum' Master Brand for Its Health Services Businesses,*
https://www.businesswire.com/news/home/20110411005701/en/UnitedHealth-Group-Announces-%E2%80%9COptum%E2%80%9D-Master-Brand-for-Its-Health-Services-Businesses , (last visited March 8, 2024)..
[39] *Id*.

Insulin Pricing Scheme to the benefit of all Defendants.

166.   As a result of numerous interlocking directorships and shared executives, UnitedHealth Group, OptumRx Holdings, LLC and Optum, Inc are directly involved in the conduct of and control OptumInsight's and Optum Rx's operations, management and business decisions related to the at-issue formulary construction, negotiations, and mail order pharmacy services to the ultimate detriment of Plaintiff.

167.   UnitedHealth Group directly or indirectly owns all the stock of Optum, Inc., OptumRx, Inc and OptumInsight, Inc.

168.   The UnitedHealth Group corporate family does not operate as separate entities. The public filings, documents and statements of UnitedHealth Group presents its subsidiaries, including Optum, Inc., OptumRx, Inc., and OptumInsight as divisions or departments of a single company "with a mission to help people live healthier lives and help make the health system work better for everyone." [40] The day-to-day operations of this corporate family reflect these public statements. These entities are a single business enterprise and should be treated as such as to all legal obligations detailed in this Complaint.

169.   All the executives of Optum, Inc., OptumRx, Inc., and OptumInsight ultimately report to the executives, including the CEO, of UnitedHealth Group.

170.   As stated above, UnitedHealth Group's executives and officers are directly involved in the policies and business decisions of Optum, Inc., OptumRx, Inc., and OptumInsight that gave rise to Plaintiff's claims in this Complaint.

171.   Collectively, Defendants UnitedHealth Group, Inc., OptumRx, Inc., OptumInsight, Inc. and Optum, Inc., including all predecessor and successor entities, are referred to as

---

[40] UnitedHealth Group, https://www.unitedhealthgroup.com/people-and-businesses/mission-values.html (last visited March 8, 2024).

"OptumRx."

172.   OptumRx is named as a Defendant in its capacities as a PBM and mail-order pharmacy.

173.   OptumRx is a pharmacy benefit manager and, as such, coordinates with Novo Nordisk, Eli Lilly, and Sanofi regarding the price of the at-issue diabetes medications, as well as for the placement of these firms' at-issue drugs on OptumRx's drug formularies.

174.   OptumRx provides pharmacy care services through a network of more than 67,000 retail pharmacies and multiple delivery facilities. Optum Rx fulfilled 1.438 million prescriptions in 2022. [41]

175.   In 2022, OptumRx managed $124 billion in pharmaceutical spending. OptumRx's 2022 revenue was over $99 billion.[42]

176.   During the relevant time period, OptumRx derived substantial revenue providing pharmacy benefits in Missouri.

177.   During the relevant time period, OptumRx offered pharmacy benefit management services nationwide and maintained standard formularies that are used nationwide, including in Missouri. During the relevant time period, those formularies included at-issue drugs, including all of those at issue in this Complaint.

178.   During the relevant time period, and contrary to their express representations, OptumRx knowingly insisted that its payor clients use the false list prices produced by the Insulin Pricing Scheme as the basis for reimbursement of the at-issue drugs.

179.   During the relevant time period, OptumRx has concealed its critical role in the generation of those false list prices.

---

[41] UnitedHealth Group, Annual Report (Form 10-K) (Dec. 31, 2022).
[42] *Id.*

180.    In its capacity as a mail-order pharmacy, OptumRx received payments from payors for, and set the out-of-pocket price paid for, the at-issue drugs based on the falsely inflated prices produced by the Insulin Pricing Scheme and, as a result, damaged Plaintiff.

181.    During the relevant time period, OptumRx dispensed the at-issue medications nationwide and in Missouri through its mail order pharmacies and derived substantial revenue from these activities in Missouri.

182.    OptumRx purchases drugs produced by the Manufacturer Defendants, including the at-issue drugs, for dispensing through its mail order pharmacies.

183.    During the relevant time period, OptumRx had express agreements with Defendants Novo Nordisk, Sanofi and Eli Lilly related to the Manufacturer Payments paid by the Manufacturer Defendants to OptumRx, as well as agreements related to the Manufacturers' at-issue drugs sold through OptumRx's mail order pharmacies.

184.    Collectively, CVS Caremark, Optum Rx, and Express Scripts are referred to as the "PBM Defendants."

### III.     JURISDICTION AND VENUE

#### A.     Subject-Matter Jurisdiction

185.    This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 and pursuant to 18 U.S.C. § 1964(c) because this action alleges violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962. This Court also has supplemental jurisdiction over the state law claims in this action pursuant to 28 U.S.C. § 1367.

#### B.     Personal Jurisdiction

186.    This Court has personal jurisdiction over each Defendant because each Defendant:(a) transacts business and/or is admitted to do business within Missouri; (b) maintains substantial contacts in Missouri; and (c) committed the violations of Missouri statutes, federal

statutes, and common law at issue in this lawsuit in whole or part within Missouri. The Insulin Pricing Scheme is and has been directed at, and has had the foreseeable and intended effect of, causing injury to persons residing in, located in, or doing business in Missouri, and to Plaintiff. All of the at-issue transactions occurred in Missouri and/or involved Missouri residents. This Court has personal jurisdiction over all Defendants pursuant to Fed. R. Civ. P. 4(k)(1)(A) because they would be subject to the jurisdiction of a court of general jurisdiction in Missouri.

187.    This Court also has personal jurisdiction over all defendants under 18 U.S.C. § 1965(b). This Court may exercise nationwide jurisdiction over the named Defendants where the "ends of justice" require national service and Plaintiff demonstrates national contacts. Here, the interests of justice require that Plaintiff be allowed to bring all members of the nationwide RICO enterprise before the Court in a single trial.

### C.    Venue

188.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and (c), because each Defendant transacts business in, is found in, and/or has agents in this District, and because some of the actions giving rise to the Complaint took place within this District. In particular, at all times during the relevant time period, Defendants provided pharmacy benefit services, provided mail-order pharmacy services, employed sales representatives, promoted and sold at-issue drugs and published prices of the at issue drugs in this District.

189.    Venue is also proper in this District pursuant to 18 U.S.C. § 1965, because all Defendants reside, are found, have an agent or transact their affairs in this District, and the ends of justice require that any Defendant residing elsewhere be brought before this Court.

### IV.    FACTUAL ALLEGATIONS

### A.    Diabetes and Insulin Therapy

Diabetes: A Disease of Epidemic Proportions

190.    Diabetes is a chronic health condition that affects how the body turns food into energy. The body breaks down most food into sugar (glucose) and releases it into the bloodstream. When blood sugar goes up, it signals the pancreas to release insulin. Insulin acts like a key to let the blood sugar into your body's cells for use as energy. With diabetes, the body doesn't make enough insulin or can't use it as well as it should. When there isn't enough insulin or cells stop responding to insulin, too much blood sugar stays in the bloodstream. Over time, that can cause serious health problems, including heart disease, vision loss, and kidney disease. There is no cure for diabetes.[43]

191.    There are two basic types of diabetes, Type 1 and Type 2.

192.    With Type 2 diabetes, the body doesn't use insulin well and can't keep blood sugar at normal levels. About 90-95% of people with diabetes have Type 2. It develops over many years and is usually diagnosed in adults (but is increasingly diagnosed in children, teens, and young adults).[44]

193.    Type 2 diabetes is often developed later in life. People with Type 2 diabetes may need insulin therapy if blood sugar targets aren't met with lifestyle changes and other medicines.[45]

194.    Type 1 diabetes is thought to be caused by an autoimmune reaction (the body attacks itself by mistake). This reaction stops the body from making insulin. Approximately 5-10% of the people who have diabetes have Type 1. Type 1 diabetes can be diagnosed at any age, and symptoms often develop quickly. People with Type 1 diabetes need to take insulin every day to survive. No one knows how to prevent Type 1 diabetes.[46]

195.    Interruptions to a diabetic's insulin regimen can have severe consequences. Missed

---

[43] *What is Diabetes?*, *supra* note 6.
[44] *Id.*
[45] Mayo Clinic, *Type 2 diabetes*, https://www.mayoclinic.org/diseases-conditions/type-2-diabetes/diagnosis-treatment/drc-20351199 (last visited March 8, 2024).
[46] *What is Diabetes?*, *supra* note 6.

or inadequate insulin therapy can trigger hyperglycemia and then diabetic ketoacidosis, which if left untreated can lead to loss of consciousness and death within days.

196.    The number of Americans with diabetes has massively increased in the last fifty years. In 1958, only 1.6 million people in the United States had diabetes. By 2018, over 34 million people in the United States, or 10.5% of the population, live with the disease.[47]

197.    The prevalence of diabetes in Missouri has increased as well. Over 537,000 Missouri adults now live with diabetes[48] and as many as 1.59 million may have prediabetes.[49]

<u>Insulin: A Century-Old Drug</u>

198.    Despite its potentially deadly impact, diabetes is highly treatable. Patients may avoid complications from diabetes if they are able to follow a prescribed treatment plan consistently.

199.    Treatment for diabetes has been available for almost a century. In 1922, Frederick Banting and Charles Best, while working at the University of Toronto, pioneered a technique for removing insulin from an animal pancreas. That insulin could then be used to treat diabetes. After discovery, Banting and Best obtained a patent and then sold it to the University of Toronto for $1 (equivalent to $14 today), explaining "Insulin does not belong to me, it belongs to the world."[50] They further stated that "[t]he patent would not be used for any other purpose than to prevent the taking out of a patent by other persons. When the details of the method of preparation are published anyone would be free to prepare the extract, but no one could secure a profitable monopoly." [51]

---

[47] CDC, *National Diabetes Statistics Report*, https://www.cdc.gov/diabetes/pdfs/data/statistics/national-diabetes-statistics-report.pdf (last visited March 8, 2024).
[48] *2023 Missouri Diabetes Report*, *supra* note 4.
[49] *The Burden of Diabetes in Missouri*, *supra* note 5.
[50] Diabetes UK, *100 Years of Insulin*, https://www.diabetes.org.uk/our-research/about-our-research/our-impact/discovery-of-insulin#:~:text=On%2023%20January%201923%2C%20Banting,to%20have%20access%20to%20it (last visited March 8, 2024).
[51] Elsie Needham, *The Manufacture of Insulin*,

200. After purchasing the patent, the University of Toronto contracted with Manufacturer Defendant Eli Lilly to scale production.[52] In the decades to follow, manufacturers developed a variety of slower-acting insulins, the first introduced by Novo Nordisk Pharmaceuticals, Inc., in 1936.[53]

201. Although early iterations of insulin were immediately perceived as lifesaving, there have been numerous incremental improvements since its discovery. Insulin from cattle and pigs was used for many years to treat diabetes and saved millions of lives, but it wasn't perfect, as it caused allergic reactions in many patients. The first genetically engineered, synthetic "human" insulin was produced in 1978 using E. coli bacteria to produce the insulin. Eli Lilly went on in 1982 to sell the first commercially available biosynthetic human insulin under the brand name Humulin.[54]

202. In 1996, Eli Lilly introduced the first analog insulin, Humalog. Analog insulin is laboratory grown and genetically altered insulin. Analogs are slight variations on human insulin that make the injected treatment act more like the insulin naturally produced and regulated by the body.[55]

203. Other rapid-acting analogs are Defendant Novo Nordisk's Novolog and Defendant Sanofi's Apidra, which have similar profiles. Diabetics use these rapid-acting insulins in combination with longer-acting insulins, such as Sanofi's Lantus and Novo Nordisk's Levemir. These analog insulins were released between 1996 and 2007.

---

https://fisherdigitus.library.utoronto.ca/exhibits/show/insulin100/manufacture-of-insulin (last visited March 8, 2024).

[52] *Id.*

[53] American Diabetes Association, *The History of a Wonderful Thing We Call Insulin*, https://diabetes.org/blog/history-wonderful-thing-we-call-insulin (last visited March 8, 2024).

[54] *Id.*

[55] Ignazio Vecchio, et al., *The Discovery of Insulin: An Important Milestone in the History of Medicine*, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6205949/#:~:text=In%201996%2C%20Eli%20 Lilly%20introduced,2000%2C%20while%20glulisine%20in%202004 (last visited March 8, 2024).

204.    In 2015, Sanofi introduced Toujeo, another long-acting insulin also similar to Lantus, however Toujeo is highly concentrated, making injection volume smaller than Lantus.[56]

205.    In 2016, Eli Lilly introduced Basaglar, which is a long-acting insulin that is biologically similar to Sanofi's Lantus.[57]

<div align="center">Current Insulin Landscape</div>

206.    While long-acting analogs may have certain advantages over human insulins, including allowing more flexibility around mealtime planning, it has not yet been demonstrated that analogs lead to better long-term outcomes. For example, a recent study published in the Journal of the American Medical Association suggests that older human insulins may work just as well as newer analog insulins for patients with Type 2 diabetes.[58]

207.    When discussing the latest iterations of insulins, Harvard Medical School professor David Nathan recently stated:

> I don't think it takes a cynic such as myself to see most of these [insulins] are being developed to preserve patent protection. The truth is they are marginally different, and the clinical benefits of them over the older drugs have been zero.[59]

208.    Moreover, all insulins at issue in this case have either been available in the same form since the late 1990s/early 2000s or are biologically equivalent to insulins that were available

---

[56] Drugs.com, *Toujeo vs Lantus – What's the difference between them?* https://www.drugs.com/medical-answers/toujeo-lantus-difference-between-3420904/#:~:text=Official%20answer&text=Both%20Toujeo%20and%20Lantus%20are,Lantus's%20100%20units%20per%20mL (last visited March 8, 2024).

[57] diatribe Learn, *FDA Approves New Insulin Glargine Basaglar – The First "Biosimilar" Insulin in the US,* https://diatribe.org/fda-approves-new-insulin-glargine-basaglar-%E2%80%93-first-%E2%80%9Cbiosimilar%E2%80%9D-insulin-us (last visited March 8, 2024).

[58] Jing Luo, et al., *Implementation of a Health Plan Program for Switching From Analogue to Human Insulin and Glycemic Control Among Medicare Beneficiaries With Type 2 Diabetes,* https://jamanetwork.com/journals/jama/fullarticle/2722772 (last visited March 8, 2024).

[59] Carolyn Y. Johnson, *Why Treating Diabetes Keeps Getting More Expensive,* WASH. POST (Oct. 31, 2016) https://www.washingtonpost.com/news/wonk/wp/2016/10/31/why-insulin-prices- have-kept-rising-for-95-years/.

<div align="center">34</div>

then.

209.    Dr. Kasia Lipska, a Yale researcher and author of a 2018 study in the Journal of the American Medical Association on the cost of insulin, explained:

> We're not even talking about rising prices for better products here. I want to make it clear that we're talking about rising prices for the same product . . . there's nothing that's changed about Humalog. It's the same insulin that's just gone up in price and now costs ten times more.[60]

210.    The cost to manufacture insulin has not increased over the years either. In fact, the average net cost of the most commonly used insulins is 20% lower today than in 2007.[61]

211.    Yet the price of insulin has continued to increase. Insulin prices have risen dramatically over the past 10 years. Between 2012 and 2016, the price almost doubled. In 2012, the average cost of insulin per diabetes patient was $2,864 per year. By 2016, it had risen to $5,705. Today, one vial of insulin can cost $250, and some people need six vials per month.[62]

212.    Further, while research and development costs often make up a large percentage of the price of a drug, in the case of insulin the initial basic research—original drug discovery and patient trials—was performed 100 years ago.

213.    Even the more recent costs, such as developing the recombinant DNA fermentation process and the creation of insulin analogs, were incurred decades ago.[63]

214.    Despite this decrease in production costs and no new research and development, the reported price of insulins has risen astronomically over the last fifteen years.

Insulin Adjuncts: Type 2 Medications

---

[60] Natalie Shure, *The Insulin Racket*, https://www.commondreams.org/views/2019/06/24/insulin-racket (last visited March 8, 2024).
[61] Simmone Shah, *Why Insulin Is So Expensive in the U.S. – And What the Inflation Reduction Act Does About It*, https://time.com/6206569/insulin-prices-inflation-reduction-act/ (last visited March 8, 2024).
[62] Singlecare, *Insulin prices: How much does Insulin cost?* https://www.singlecare.com/blog/insulin-prices/ (last visited March 8, 2024).
[63] *The Discovery of Insulin: An Important Milestone in the History of Medicine*, *supra* note 55.

215.     Over the past decade, the Manufacturer Defendants also released a number of non-insulin drugs that help control the level of insulin in the bloodstream of Type 2 diabetics.

216.     In 2010, Novo Nordisk released Victoza as an adjunct to insulin to improve glycemic control. In 2014, Eli Lilly released a similar drug, Trulicity. In 2016, Sanofi did the same with Soliqua. In 2017, Novo Nordisk did the same with Ozempic.

217.     Victoza, Trulicity, and Ozempic are all medications known as glucagon-like peptide-1 receptor agonists ("GLP-1") and mimic the GLP-1 hormone that is already produced in the body. Soliqua is a combination long-acting insulin and GLP-1 drug. Each of these drugs can be used in conjunction with insulins to control diabetes.

218.     Today, Manufacturer Defendants dominate the market for all at-issue drugs. The following is a list of at-issue drugs at issue in this lawsuit:

| Insulin Type | Name | Manufacturer |
|---|---|---|
| Human (Rapid-Acting) | Humulin R | Eli Lilly |
| | Humulin R 500 | Eli Lilly |
| | Novolin R | Novo Nordisk |
| Human (Intermediate) | Humulin N | Eli Lilly |
| | Humulin 70/30 | Eli Lilly |
| | Novolin N | Novo Nordisk |
| | Novolin 70/30 | Novo Nordisk |
| Analog (Rapid-Acting) | Humalog | Eli Lilly |
| | Novolog | Novo Nordisk |
| | Apidra | Sanofi |
| Analog (Long-Acting) | Lantus | Sanofi |

| | | |
|---|---|---|
| | Levemir | Novo Nordisk |
| | Basaglar | Eli Lilly |
| | Toujeo | Sanofi |
| | Tresiba | Novo Nordisk |
| Insulin Adjuncts | Trulicity | Eli Lilly |
| | Victoza | Novo Nordisk |
| | Ozempic | Novo Nordisk |
| | Soliqua | Sanofi |

**B.      The Dramatic Rise in the Prices of At-Issue Drugs**

219.    The price of insulin has risen inexplicably over the past 20 years at a rate far higher than the rate of inflation. One vial of Humalog (insulin lispro), which used to cost $21 in 1999, costs $332 in 2019, reflecting a price increase of more than 1000%.[64]

220.    By 2016, the average price-per-month of the four most popular types of insulin rose to $450. One-quarter of patients with Type 1 or 2 diabetes have reported using less insulin than prescribed due to these high costs[65], a behavior that is dangerous to a diabetic's health and can lead to a variety of complications including death.

221.    Eli Lilly raised the price of its Humalog 1,219% per vial since it launched, Novo Nordisk raised the price of NovoLog 627% since launch and Sanofi has raised the price of Lantus

---

[64] S. Vincent Rajkumar, *The High Cost of Insulin in the United States: An Urgent Call to Action,* https://www.mayoclinicproceedings.org/article/S0025-6196(19)31008-0/fulltext (last visited March 8, 2024).
[65] Kendall Teare, *One in four patients say they've skimped on insulin because of high cost,* https://news.yale.edu/2018/12/03/one-four-patients-say-theyve-skimped-insulin-because-high-cost (last visited March 8, 2024).

715%.[66]

222. Since 1997, Defendant Eli Lilly has raised the price of a vial of Humulin R (500U/ML) from $165 to $1,784.

**Rising reported prices of Humulin R (500U/mL) from 1997-2021**

[66] Congress found that among big-selling insulin products, Eli Lilly raised the price of its Humalog 1,219% per vial since it launched, Novo Nordisk raised the price of NovoLog 627% since launch and Sanofi has raised the price of Lantus 715%. Diane Bartz, *Drugmakers aim big price hikes at U.S. patients, congressional report finds*, https://www.reuters.com/world/us/drugmakers-aim-big-price-hikes-us-patients-congressional-report-2021-12-10/ (last visited March 8, 2024).



223.    Since 1996, Defendant Eli Lilly has raised the price for a package of pens of Humalog from less than $100 to $663 and from less than $50 for a vial to $342.

**Rising reported prices of Humalog vials and pens from 1996-2021**



224.    Novo Nordisk has also increased its prices—from 2006 to 2021, Levemir rose from $162 to $555 for pens and from under $100 to $370 per vial.





Rising reported prices of Levemir from 2006-2021

225.   From 2002 to 2021, Novo Nordisk raised the price of Novolog from $108 to $671 for a package of pens and from less than $50 to $347 for a vial.

**Rising reported prices of Novolog vials and pens from 2002-2021**



226.     Defendant Sanofi has kept pace as well, increasing the prices for Lantus, the top-selling analog insulin, from less than $200 in 2006, to over $500 in 2020 for a package of pens and from less than $50 to $340 for a vial.

**Rising reported prices of Lantus vials and pens from 2001-2021**



227.     Driven by these price hikes, payors' and diabetics' spending on at-issue drugs has skyrocketed with totals in the tens of billions of dollars.

<u>The Defendant-Manufacturers Have Increased Prices in Lockstep</u>

228.     The Manufacturer Defendants not only dramatically increased prices for the at-issue diabetes treatments, but they also did so in perfect lockstep.

229.     In thirteen instances since 2009, competitors Sanofi and Novo Nordisk raised the reported prices of their insulins in tandem, taking the same price increase down to the decimal point within a few days of each other, and sometimes within a few hours.[67]

230.     This practice of increasing drug prices in lockstep with competitors is known as

---

[67] Robert Langreth, *Hot Drugs Show Sharp Price Hikes in Shadow Market*, https://www.bloomberg.com/news/articles/2015-05-06/diabetes-drugs-compete-with-prices-that-rise-in-lockstep..

"shadow pricing" and, as healthcare expert Richard Evans from SSR Health recently stated, "is pretty much a clear signal that your competitor does not intend to price-compete with you."[68]

231.    In 2016, Novo Nordisk and Sanofi's lockstep increases for the at-issue drugs were responsible for the highest drug price increases in the entire pharmaceutical industry.

232.    Eli Lilly and Novo Nordisk have engaged in the same lockstep behavior with respect to their rapid-acting analog insulins, Humalog and Novolog.

233.    Lockstep pricing demonstrating collusive behavior with respect to Lantus and Levemir, is illustrated below.

**Rising reported prices of long-acting insulins**



234.    Illustrated below is this behavior with respect to rapid-acting insulins, Eli Lilly's Humalog and Novo Nordisk's Novolog.

---

[68] *Id.*



235.    Illustrated below is this behavior with respect to the human insulins, Eli

Lilly's Humulin and Novo Nordisk's Novolin.



236.    Illustrated below is Defendants' lockstep price increases for their Type 2 drugs, Trulicity, Victoza and Ozempic.



**Rising reported prices of Type 2 drugs**

237.    Illustrated below is how, collectively, the Manufacturer Defendants have exponentially raised the prices of insulin products in near perfect unison.

**Lockstep insulin price increases**



238.    The Manufacturer Defendants' collusive price increases have made at-issue drugs unaffordable for many diabetics.

### C.    Pharmaceutical Payment and Supply Chain

239.    The prescription drug industry consists of a deliberately opaque network of entities engaged in multiple distribution and payment structures. These entities include drug manufacturers, wholesalers, pharmacies, health plans/third-party payors, PBMs, and patients.

240.    Generally speaking, branded prescription drugs like the at-issue drugs, are distributed in one of two ways: (1) from manufacturer to wholesaler, wholesaler to pharmacy, and pharmacy to patient or (2) from manufacturer to mail-order pharmacy to patient.

241.    In the pharmaceutical industry, the pricing chain is distinct from the distribution chain. The prices for the drugs distributed in the pharmaceutical chain are different for each participating entity: different actors pay different prices set by different entities for the same drugs. The unifying factor is that the price that each entity in the pharmaceutical chain pays for a drug is tied directly to the price set by the manufacturer.

242.     There is no transparency in this pricing system. Typically, only a brand drug's reported price—also known as its Average Wholesale Price (AWP) or the mathematically-related Wholesale Acquisition Cost (WAC)—is available.

243.     Drug manufacturers self-report AWP or other prices upon which AWP is based to publishing compendiums such as First DataBank, Redbook, and others who then publish that price.

244.     As a direct result of the PBMs' conduct, AWP persists as the most commonly and continuously used reported price in reimbursement and payment calculations and negotiations for both payors and patients.

**D.     The PBMs' Role in the Pharmaceutical Payment Chain**

245.     The PBMs are at the center of the convoluted pharmaceutical payment chain, as illustrated[69]:

---

[69] Saketh Papaiahgari, *US Pharmaceutical System (Part 1 – Key Players)*, https://sakethpapaiahgari.com/2020/04/05/structure-of-us-pharmaceuticals-system/.



## U.S. Distribution and Reimbursement System: Patient-Administered, Outpatient Drugs

GPO = Group Purchasing Organization; PSAO = Pharmacy Services Administrative Organization; DIR = Direct and indirect remuneration
Source. *The 2019 Economic Report on U.S. Pharmacies and Pharmacy Benefit Managers* (https://drugch.nl/pharmacy). Chart
illustrates flows for Patient-Administered, Outpatient Drugs. Please note that this chart is illustrative. It is not intended to be a
complete representation of every type of product movement, financial flow, or contractual relationship in the marketplace.



246.    The PBMs develop drug formularies, process claims, create a network of retail pharmacies, set the prices that the payor will pay for prescription drugs in coordination with the manufacturers, and are paid by the payor to reimburse pharmacies for the drugs utilized by the payor's beneficiaries.

247.    The PBMs also contract with a network of retail pharmacies. Pharmacies agree to dispense drugs to patients and pay fees back to the PBMs. The PBMs reimburse pharmacies for the drugs dispensed.

248.    The PBMs also own mail-order and specialty pharmacies, which purchase and take possession of prescription drugs, including those at-issue here, and directly supply those drugs to

patients by mail.

249.   Often—including for the at-issue drugs—the PBMs purchase drugs directly from the Manufacturers and distribute them directly to the patients.

250.   Even where PBM mail-order pharmacies purchase drugs from wholesalers, their costs are set by direct contracts with the manufacturers.

251.   In addition, and of particular significance here, the PBMs contract with pharmaceutical manufacturers, including the manufacturers. The PBMs benefit from the rebates, fees, and other consideration from the manufacturers, that are paid back to the PBM, including Manufacturer Payments related to the at-issue drugs.

252.   The manufacturers also interact with the PBMs in connection with other services including health and educational programs and patient and prescriber outreach with respect to drugs not at issue in this Complaint.

253.   These relationships allow PBMs to exert tremendous influence over what drugs are available throughout the United States, including in St. Louis County, on what terms and at what prices.

254.   Thus, PBM Defendants are at the center of the flow of money in the pharmaceutical supply chain. In sum:

- the PBM Defendants negotiate the price that a payor pays for each prescription drug (based on prices generated by the Insulin Pricing Scheme);

- the PBM Defendants separately negotiate a different (and often lower) price that pharmacies in their networks receive for that same drug;

- the PBM Defendants set the amount in fees that the pharmacy pays back to the PBM for each drug sold (based on prices generated by the Insulin Pricing Scheme);

- the PBM Defendants set the price paid for each drug sold through their mail-order pharmacies (based on prices generated by the Insulin Pricing Scheme); and

- the PBM Defendants negotiate the amount that the Manufacturers pay back to the PBM for each drug sold (based on prices generated by the Insulin Pricing Scheme).

255.     Remarkably, for the majority of these transactions, only the PBMs are privy to the amount that any other entity in this supply chain is paying or receiving for the same drugs. This lack of transparency allows Defendants to extract billions of dollars from this payment and supply chain without detection.

256.     In every interaction that the PBM Defendants have within the pharmaceutical pricing chain, they stand to profit from the prices generated by the Insulin Pricing Scheme.

<u>The Increased Power of PBMs in the Pharmaceutical Supply Chain</u>

257.     When PBMs were first created in the 1960s, they functioned largely as claims processors. Over time, however, they have taken on a larger and larger role in the pharmaceutical industry. Today, PBMs wield significant control over the drug pricing system.

258.     One of the roles PBMs took on was negotiating with drug manufacturers, ostensibly on behalf of payors. In doing so, PBMs affirmatively represented that they were using their leverage to drive down drug prices.

259.     In the early 2000s, pharmacies started buying PBMs. When a PBM combines with a pharmacy, it has additional incentives to collude with manufacturers to keep certain prices high.[70]

260.     These incentives still exist today with respect to both retail and mail-order pharmacies housed within the PBMs' corporate families.

261.     More recently, further consolidation in the industry has allowed PBMs to gain a disproportionate amount of market power.

262.     In total, nearly forty different PBM entities have merged or otherwise been

---

[70] Brian S. Feldman, *Big pharmacies are dismantling the industry that keeps US drug costs even sort-of under control*, https://qz.com/636823/big-pharmacies-are-dismantling-the-industry-that-keeps-us-drug-costs-even-sort-of-under-control (last visited March 8, 2024)

absorbed into what are now the PBM Defendants.

263.     In addition, each of the PBM Defendants is now owned by another significant player within the pharmaceutical chain: Express Scripts merged with Cigna in a $67 billion-dollar deal; Caremark was bought by the largest pharmacy in the United States, CVS, in a deal valued at $21 billion; CVS also now owns Aetna following a $69 billion-dollar deal; and OptumRx was acquired by the largest health insurance company in the United States, UnitedHealth Group.

264.     This consolidation is illustrated below:

| 2011 | medco | EXPRESS SCRIPTS | PRIME THERAPEUTICS | SXC Health Solutions, Inc. | Catalyst Health Solutions | OPTUMRx | CVS CAREMARK |
|------|-------|-----------------|--------------------|-----|-----|---------|---------------|
| 2013 | EXPRESS SCRIPTS | | PRIME THERAPEUTICS | catamaran | | OPTUMRx | CVS CAREMARK |
| 2015 | EXPRESS SCRIPTS | | PRIME THERAPEUTICS | OPTUMRx | | | CVS CAREMARK |
| 2022 | EXPRESS SCRIPTS | | | OPTUMRx | | | CVS CAREMARK |

52

265.    After merging or acquiring all their competitors, and now backed by multibillion-dollar corporations, the PBM Defendants have taken over the market in the past decade, controlling more than 80% of the market and managing pharmacy benefits for over 266 million Americans.[71]

266.    Together, the PBM Defendants report more than $300 billion in annual revenue.

267.    The PBM Defendants use this market consolidation as leverage when negotiating with other entities in the pharmaceutical pricing chain. Last year, industry expert Lindsay Bealor Greenleaf from Advice and Vision for the Healthcare Ecosystem (ADVI), which describes itself as a strategic consulting partner to the healthcare and life sciences ecosystem, described this imbalance in power; "[i]t's really difficult to engage in any type of fair negotiations when one of the parties has that kind of monopoly power . . . I think that is something that is going to continue getting attention, especially as we see more of these payors and PBMs continue to try to further consolidate."[72]

<u>The Insular Nature of the Pharmaceutical Industry</u>

268.    The insular nature of the pharmaceutical industry has provided Defendants with ample opportunity for contact and communication with their competitors, as well as with the other PBM Defendants and Manufacturer Defendants, in order to devise and agree to the Insulin Pricing Scheme.

---

[71] Committee on Oversight and Accountability, *Hearing Wrap Up: Pharmacy Benefit Managers Push Anticompetitive Drug Pricing Tactics to Line Their Own Pockets*, https://oversight.house.gov/release/hearing-wrap-up-pharmacy-benefit-managers-push-anticompetitive-drug-pricing-tactics-to-line-their-own-pockets%ef%bf%bc/#:~:text=Instead%20of%20fierce%20competition%2C%20now%20just%20three%20PBMs,and%20owns%2C%20or%20is%20owned%2C%20by%20a%20pharmacy (last visited March 8, 2024).
[72] Paige Minemyer, *Senate hearing puts spotlight on debate over consolidation in PBM market*, https://www.fiercehealthcare.com/payer/senate-hearing-puts-spotlight-debate-over-consolidation-pbm-market (last visited March 8, 2024).

269.    Each Manufacturer Defendant is a member of the Pharmaceutical Research and Manufacturers of America ("PhRMA") and has routinely communicated through PhRMA's meetings and platforms in furtherance of the Insulin Pricing Scheme.

270.    David Ricks (CEO of Eli Lilly), Paul Hudson (CEO of Sanofi), and Douglas Langa (Executive Vice President of Novo Nordisk), all are or have been part of the members of the PhRMA board of directors and/or part of the PhRMA executive leadership team.[73]

271.    The PBM Defendants also routinely communicate through direct interaction with their competitors and the Manufacturer Defendants at trade associations and industry conferences.

272.    Each year during the relevant time period, the main PBM trade association, the Pharmaceutical Care Management Association ("PCMA"), held several yearly conferences, including its Annual Meeting and its Business Forum conferences.

273.    The current board of the PCMA includes David Joyner (Executive Vice President CVS Health and President CVS Caremark), Dr. Patrick Conway (CEO, Optum Rx) and Adam Kautzner (President, Express Scripts).[74]

274.    All PBM Defendants are members of, and as a result of their leadership positions, control the PCMA. The Manufacturer Defendants are affiliate members of this organization.

275.    Every year, high-level representatives and corporate officers from both the PBM Defendants and Manufacturer Defendants attend these conferences to meet in person and engage in discussions, including those in furtherance of the Insulin Pricing Scheme.

276.    In fact, for at least the last six years, all Manufacturer Defendants have been "Partners" or "Presidential Sponsors" of these PBM conferences.[75]

---

[73] PhRMA, *Our Mission*, https://phrma.org/about (last visited March 8, 2024).
[74] PCMA, *Board of Directors*, https://www.pcmanet.org/board-of-directors/ (last visited March 8, 2024).
[75] See, e.g., PCMA, *PCMA Sponsors*, https://www.pcmanet.org/about/pcma-sponsors/ (last visited March 8, 2024).

277. Notably, many of the forums at these conferences are specifically advertised as offering opportunities for private, non-public communications. For example, the conferences offer "Member Company Receptions" that "offer excellent opportunities for interactions between PBM members, drug manufacturers, and other industry partners" where "PBM members…serve as hosts in their private reception rooms."[76]

278. In addition, all PCMA members, affiliates and registered attendees of these conferences are invited to join PCMA-Connect, "an invitation-only LinkedIn Group and online networking community."[77]

279. As PCMA members, the PBM Defendants and Manufacturer Defendants utilized both PCMA-Connect, as well as the private meetings at the PCMA conferences, to exchange information and to reach agreements in furtherance of the Insulin Pricing Scheme.

280. Notably, key at-issue lockstep price increases occurred shortly after the Defendants meet at PCMA meetings. For example, on September 26 and 27, 2017, the PCMA held its annual meeting where each of the Manufacturer Defendants hosted private rooms and executives from each Defendant engaged in several meetings throughout the conference. Mere days after the conference, on October 1, 2017, Sanofi increased Lantus's list price by 3% and Toujeo's list by 5.4%. Novo Nordisk also recommended that their company make a 4% list price increase effective on January 1, 2018, to match the Sanofi increase.[78]

281. Likewise, on May 30, 2014, Novo Nordisk raised the list price of Levemir several hours after Sanofi made its list price increase on Lantus and this occurred only a few weeks after

---

[76] PCMA, https://www.pcmanet.org/pcma-event/annual-meeting-2021/ (last visited March 8, 2024).

[77] PCMA, https://www.pcmanet.org/contact/pcma-connect/ (last visited March 8, 2024).

[78] *Documents Produced by Novo Nordisk,* https://www.finance.senate.gov/imo/media/doc/Novo_Redacted.pdf (last visited March 8, 2024).

the 2014 PCMA spring conference in Washington, D.C. attended by representatives from all the PBM Defendants.[79]

282.    Further, the PBM Defendants control the PCMA and have weaponized it to further their interests and to hide the Insulin Pricing Scheme. The PCMA has brought numerous lawsuits and lobbying campaigns aimed at blocking drug pricing transparency efforts, including recently suing the Department of Health and Human Services (HHS) to block the finalized HHS "rebate rule," which would eliminate anti-kickback safe harbors for Manufacturer Payments and instead offer them as direct-to-consumer discounts.[80]

283.    Communications among the PBM Defendants are facilitated by the fluidity and frequency with which executives move from one PBM Defendant to another.  Examples of the overlapping relationships include:

•      Mark Thierer worked as an executive at CVS Caremark prior to becoming the CEO of OptumRx in 2016;[81]

•      Bill Wolfe was the President of the PBM Catalyst Rx (now OptumRx) prior to becoming the President of Aetna Rx in 2015;[82]

•      Duane Barnes was the Vice President of Medco (now Express Scripts) prior to becoming Division President of Aetna Rx in 2006;[83]

•      Albert Thigpen was a Senior Vice President at CVS Caremark prior to becoming a Senior Vice President at OptumRx in 2011;[84]

•      Harry Travis was the Chief Operating Officer at Medco (now Express Scripts) before becoming a Vice President at Aetna Rx in 2008, and became a Senior Vice President at CVS Caremark in 2020;[85] and

---

[79] *Id.*
[80] Paige Minemyer, *PCMA sues Trump administration over rebate rule*, https://www.fiercehealthcare.com/payer/pcma-sues-trump-administration-over-rebate-rule (last visited March 8, 2024).
[81] https://www.linkedin.com/in/mark-thierer-b417095/details/experience/.
[82] https://www.linkedin.com/in/bill-wolfe-5725775/details/experience/.
[83] https://www.linkedin.com/in/duanehbarnes76/details/experience/.
[84] https://www.linkedin.com/in/albert-thigpen-3483335/details/experience/.
[85] https://www.linkedin.com/in/hjtravis/details/experience/.

• Bill Kiefer was a Vice President of Express Scripts before becoming a Senior Vice President at OptumRx in 2015.[86]

### E.    The Insulin Pricing Scheme

284.    The market for the at-issue drugs is unique because it is highly concentrated with little to no generic/biosimilar options. The at-issue drugs also have similar efficacy and risk profiles.

285.    These qualities should afford the PBM Defendants great leverage in negotiating with the Manufacturer Defendants for formulary placement. In this scenario, competition should drive prices down. But the PBM Defendants do not want the prices for at-issue drugs to go down.

286.    The Manufacturer Defendants understand that the PBM Defendants make more money from increasing prices. For example, the January 2021 Senate Insulin Report, in summarizing the internal documents produced by the Manufacturers, noted the following:

> [B]oth Eli Lilly and Novo Nordisk executives, when considering lower list prices, were sensitive to the fact that PBMs largely make their money on rebates and fees that are based on a percentage of a drug's list price . . . In other words, the drug makers were aware that higher list prices meant higher revenue for PBMs.[87]

287.    The documents released by the Senate contemporaneous with the January 2021 Senate Insulin Report further evidence the extent to which the Manufacturer Defendants' pricing strategy is focused on the PBM Defendants' profitability. In an internal email dated August 6, 2015, Novo Nordisk executives debated delaying increasing the price of an at-issue drug in order to make the increase more profitable for CVS Caremark, stating:

> Should we take 8/18 [for a price increase], as agreed to by our [pricing committee], or do we recommend pushing back due to the recent CVS concerns on how we take price? . . . We know CVS has stated their disappointment with our price increase

---

[86] https://www.linkedin.com/in/billkiefer/details/experience/.

[87] *Grassley, Wyden Release Insulin Investigation, Uncovering Business Practices Between Drug Companies and PBMs That Keep Prices High*, https://www.finance.senate.gov/chairmans-news/grassley-wyden-release-insulin-investigation-uncovering-business-practices-between-drug-companies-and-pbms-that-keep-prices-high (last visited March 8, 2024).

strategy (ie taking just after the 45th day) and how it essentially results in a lower price protection, admin fee and rebate payment for that quarter/time after our increase . . . it has been costing CVS a good amount of money.[88]

288.   The Manufacturer Defendants also understand that because of the PBM Defendants' market dominance, most payors, including St. Louis County, accept the baseline national formularies offered by the PBM Defendants with respect to the at-issue drugs.

289.   The Insulin Pricing Scheme is the result of this dynamic. Both sets of Defendants realized that if the Manufacturer Defendants artificially inflate their prices, while at the same time paying large, undisclosed Manufacturer Payments back to the PBM Defendants, both parties would make billions of dollars.

290.   Over the course of the last fifteen years the Manufacturer Defendants have raised their prices exponentially and paid larger and larger amounts of Manufacturer Payments back to the PBM Defendants, in unison.

291.   In exchange for the Manufacturer Defendants artificially inflating their prices and paying the PBM Defendants substantial amounts in Manufacturer Payments, the PBM Defendants grant preferred status on their national formularies to those of the Manufacturer Defendants' at-issue drugs with the most elevated price and the highest Manufacturer Payment amount.

292.   During the last fifteen years, the amount of Manufacturer Payments paid to the PBM Defendants has increased substantially. For example, the January 2021 Senate Insulin Report found that:

> In July 2013, Sanofi offered rebates between 2% and 4% for preferred placement on CVS Caremark's commercial formulary. Five years later, in 2018, Sanofi rebates were as high as 56% for preferred formulary placement. Similarly, rebates to Express Scripts and OptumRx increased dramatically between 2013 and 2019 for long-acting insulins. For example, in 2019, Sanofi offered OptumRx rebates up to 79.75% for Lantus for preferred formulary placement on their client's commercial formulary, compared to just 42% in 2015. Similarly, Novo Nordisk offered Express Scripts rebates up to 47% for Levemir for preferred formulary placement on their client's

---

[88] *Documents Produced by Novo Nordisk*, supra n. 78.

commercial formulary, compared to 25% in 2014.[89]

293.    Beyond increased rebate demands, the PBM Defendants have also requested and received larger and larger administrative fee payments from the Manufacturer Defendants during the relevant time period.

294.    A recent study by the Pew Charitable Trust estimated that, between 2012 and 2016, the amount of administrative and other fees that the PBMs requested and received from the Manufacturers tripled, reaching more than $16 billion.[90]

295.    Contrary to their public representations, the PBM Defendants' negotiations and agreements with the Manufacturer Defendants (and the formularies that result from these agreements) are causing the precipitous price increases for the at-issue drugs.

296.    As a result of the Insulin Pricing Scheme, every payor, including Plaintiff, that pays for and/or reimburses for the at-issue drugs has been overcharged.

297.    Moreover, the PBM Defendants use artificially inflated prices to misrepresent the amount of "savings" they generate for diabetics, payors, and the healthcare system. For example, in January 2016, Express Scripts' president Tim Wentworth stated at the 34th annual JP Morgan Healthcare Conference that Express Scripts "saved our clients more than $3 billion through the Express Scripts National Preferred Formulary…[91] Likewise, in April 2019, CVS Caremark president Derica Rice stated, "Over the last three years . . . CVS Caremark has helped our clients save more than $141 billion by blunting drug price inflation, prioritizing the use of effective, lower-

---

[89] *Insulin: Examining the Factors Driving the Rising Cost of a Century Old Drug*, *supra* note 34.
[90] The Pew Charitable Trusts, *The Prescription Drug Landscape, Explored*, https://www.pewtrusts.org/-/media/assets/2019/03/the_prescription_drug_landscape-explored.pdf (last visited March 8, 2024).
[91] Surabhi Dangi-Garimella, *PBMs Can Help Bend the Cost Curve: Express Scripts' Tim Wentworth*, https://www.ajmc.com/view/pbms-can-help-bend-the-cost-curve-express-scripts-tim-wentworth (last visited March 8, 2024).

59

cost drugs and reducing the member's out- of-pocket spend."[92]

298.    The PBM Defendants also misrepresent the amount of "savings" they generate to their payor clients and prospective clients, because they fail to disclose that the amount of "savings" they have generated is calculated based on the false list prices, which are not actually paid by any entity in the pharmaceutical pricing chain, and which the PBM Defendants are directly responsible for artificially inflating.

299.    Importantly, the Insulin Pricing Scheme is a coordinated effort between the Manufacturer Defendants and the PBM Defendants that each agreed to and participated in, and that created enormous profits for all of Defendants. For example:

      a.    The Manufacturer Defendants and the PBM Defendants are in constant communication and regularly meet and exchange information to construct and refine the PBM formularies that fuel the scheme. As part of these communications, the Manufacturer Defendants are directly involved in determining not only where their own at-issue drugs are placed on the PBM Defendants' formularies and with what restrictions, but also determining the same for competing products;

      b.    The Manufacturer Defendants and the PBM Defendants share confidential and proprietary information with each other to further the Insulin Pricing Scheme, including market data gleaned from the PBM Defendants' drug utilization tracking efforts and mail order pharmacy claims, internal medical efficacy studies, and financial data. Defendants then use this information in coordination to set artificially inflated prices for the at-issue drugs and construct their formularies in the manner that is most profitable for both sets of Defendants. The data that is used to further this coordinated scheme is compiled, analyzed, and shared either by departments directly housed within the PBM Defendant or by subsidiaries of the PBM Defendant, as is the case with OptumRx, which utilizes OptumInsight and Optum Analytics; and

      c.    The Manufacturer Defendants and the PBM Defendants engage in coordinated outreach programs directly to patients, pharmacies, and prescribing physicians to convince them to switch to the at-issue drugs that are more profitable for the PBM Defendants and Manufacturer Defendants, even drafting and editing letters in tandem to send out to diabetes patients on behalf of the PBM Defendants' clients. For example, the January 2021 Senate Insulin Report released an email where Eli Lilly discussed paying

---

[92] CVS Health, *CVS Health PBM Solutions Blunted the Impact of Drug Price Inflation, Helped Reduce Member Cost, and Improved Medication Adherence in 2018*, https://www.prnewswire.com/news-releases/cvs-health-pbm-solutions-blunted-the-impact-of-drug-price-inflation-helped-reduce-member-cost-and-improved-medication-adherence-in-2018-300830167.html (last visited March 8, 2024).

Defendant UnitedHealth Group and OptumRx additional rebates for every client that was converted to formularies that exclusively preferred Eli Lilly's at-issue drugs, including Humalog. The email continued: "United's leadership committee made one ask of Lilly – that we are highly engaged in the communication/pull through plan.[93] I of course indicated we fully expect to support this massive patient transition [to Eli Lilly's at-issue drugs favored by United] and provider education with the full breadth of Lilly resources. UHC also proactively thanked Lilly for our responsiveness, solution generation and DBU execution."[94]

300.   Instead of using their significant bargaining power to lower drug prices as they claim, Defendants use their dominant positions to work together to generate billions of dollars in illicit profits at the expense of payors. Further, this scheme endangers the lives of diabetics and payors by inflating the prices of these life-saving drugs.

## F.   Defendants Admit that They Have Engaged in the Insulin Pricing Scheme and that It Is Harming Diabetics

301.   On April 10, 2019, the United States House of Representatives Committee on Energy and Commerce held a hearing on Defendants' Insulin Pricing Scheme titled, "Priced Out of a Lifesaving Drug: Getting Answers on the Rising Cost of Insulin."[95]

302.   Representatives from all Defendants testified at the Congressional hearing. Each Defendant acknowledged that the price for insulin has increased exponentially in the past fifteen years.[96]

303.   Further, each Defendant explicitly admitted that the prices that patients pay out-of-pocket for insulin are too high.[97] For example:

---

[93] "Pull through" is an industry term that refers to an integrated process between PBMs and Manufacturers aimed at moving market share and increasing sales for a certain product following the PBM granting that product preferred placement on its formulary.

[94] Documents Produced by Eli Lilly, https://www.finance.senate.gov/imo/media/doc/Eli%20Lilly_Redacted%20v1.pdf (last visited March 8, 2024).

[95] *Priced Out of a Lifesaving Drug: Getting Answers on the Rising Cost of Insulin*, https://www.govinfo.gov/content/pkg/CHRG-116hhrg39747/html/CHRG-116hhrg39747.htm. (last visited March 8, 2024).

[96] *Id.*

[97] *Id.*

- Dr. Sumit Dutta, Chief Medical Officer of OptumRx stated, "A lack of meaningful competition allows the [M]anufacturers to set high [reported] prices and continually increase them which is odd for a drug that is nearly 100 years old and which has seen no significant innovation in decades. These price increases have a real impact on consumers in the form of higher out- of-pocket costs."

- Thomas Moriarty, Chief Policy and External Affairs Officer and General Counsel for CVS Health testified, "A real barrier in our country to achieving good health is cost, including the price of insulin products which are too expensive for too many Americans. Over the last several years, [reported] prices for insulin have increased nearly 50 percent. And over the last ten years, [reported] price of one product, Lantus, rose by 184 percent."

- Mike Mason, Senior Vice President of Eli Lilly when discussing how much diabetics pay out-of-pocket for insulin stated "it's difficult for me to hear anyone in the diabetes community worry about the cost of insulin. Too many people today don't have affordable access to chronic medications . . ."

- Kathleen Tregoning, Executive Vice President External Affairs at Sanofi, testified, "Patients are rightfully angry about rising out-of-pocket costs and we all have a responsibility to address a system that is clearly failing too many people. . . we recognize the need to address the very real challenges of affordability . . . Since 2012, average out-of-pocket costs for Lantus have risen approximately 60 percent for patients . . ."

- Doug Langa, Executive Vice President of Novo Nordisk, stated, "On the issue of affordability . . . I will tell you that at Novo Nordisk we are accountable for the [reported] prices of our medicines. We also know that [reported] price matters to many, particularly those in high-deductible health plans and those that are uninsured."

304.  Notably, none of the testifying Defendants claimed that the significant increase in the price of insulin was related to competitive factors such as increased costs or improved clinical benefit.

305.  Defendants admitted that they agreed to and did participate in the Insulin Pricing Scheme and that the rise in prices was a direct result of the scheme.

306.  For example, at the April 2019 Congressional hearing Novo Nordisk's President, Doug Langa, explained Novo Nordisk's and the PBM Defendants' role in perpetuating the "perverse incentives" of the Insulin Pricing Scheme[98]:

[T]here is this perverse incentive and misaligned incentives (in the insulin pricing

---

[98] *Id.*

system) and this encouragement to keep [reported] prices high. And *we've been participating in that system* because the higher the [reported] price, the higher the rebate . . .

There is a significant demand for rebates…

We spent up to $18 billion last year in rebates, discounts, and fees to provide formulary access…

[If we eliminate all the rebates] we would be in jeopardy of losing [our formulary] positions.

(Emphasis added.)

307.    Eli Lilly, too, has admitted that it raises reported prices as a *quid pro quo* for formulary positions. At the April 2019 Congressional hearing, Mike Mason, Senior Vice President of Eli Lilly testified:[99]

Seventy-five percent of our [reported] price is paid for rebates and discounts to secure [formulary position] . . .

Two hundred and ten dollars of a vial of Humalog is paid for discounts and rebates. . . .

We have to provide rebates [to PBMs] in order to provide and compete for [formulary position] so people can use our insulin.

308.    Sanofi also conceded its participation in the Insulin Pricing Scheme. When testifying at the April 2019 Congressional hearing, Kathleen Tregoning, Executive Vice President for External Affairs of Sanofi, testified[100]:

The rebates are how the system has evolved. The rebates are part of the negotiation to secure formulary placement…

I think the system became complex and rebates generated through negotiations with PBMs are being used to finance other parts of the healthcare system and not to lower prices to the patient…

309.    The PBM Defendants also admitted at the April 2019 Congressional hearing that

---

[99] *Id.*
[100] *Id.*

they grant preferred, or even exclusive, formulary position because of higher Manufacturer Payments paid by the Manufacturer Defendants.

310.    Amy Bricker, Senior Vice President of Express Scripts, when asked to explain why Express Scripts did not grant an insulin with a lower reported price preferred formulary status, answered, "Manufacturers do give higher [payments] for exclusive [formulary] position . . ."[101]

311.    While all Defendants acknowledged their participation in the Insulin Pricing Scheme before Congress, each Defendant group pointed the finger at the other as the more responsible party in an attempt to avoid culpability for the precipitous price increase.

312.    The PBM Defendants specifically testified to Congress that the Manufacturer Defendants are solely responsible for their reported price increases and that the Manufacturer Payments that the PBM Defendants receive are not correlated to rising insulin prices.

313.    This statement is objectively false. A February 2020 study by the Leonard D. Schaeffer Center for Health Policy & Economics at the University of South California found that an increase in the amount that the Manufacturer Defendants pay back to the PBM Defendants is directly correlated to an increase in prices—on average, a $1 increase in Manufacturer Payments is associated with a $1.17 increase in price—and that reducing or eliminating Manufacturer Payments could result in lower prices and reduced out-of-pocket expenditures.[102]

314.    Further, in large part because of the increased reported prices, and related Manufacturer Payments, the PBM Defendants' profit per prescription has grown exponentially over the same time period that insulin prices have been increasing. By way of example, since 2003 Defendant Express Scripts has seen its profit per prescription increase over 500% per adjusted

---

[101] *Id.*

[102] Neeraj Sood, et al. *The Association Between Drug Rebates and List Prices*, https://healthpolicy.usc.edu/research/the-association-between-drug-rebates-and-list-prices/ (last visited March 8, 2024).

prescription.[103]

315.    The Manufacturer Defendants, on the other hand, claimed before Congress that the PBM Defendants were responsible for high insulin prices because of their demands for higher Manufacturer Payments in exchange for formulary placement. As a result, the Manufacturers argue, they have not been profiting from insulin due to declining net prices of these drugs.

316.    However, that also is not true. A 2020 study by JAMA recently published in the *Wall Street Journal* provides data suggesting that the net prices of branded insulin products have actually increased by 51% between 2007 and 2018.[104]

317.    In addition, a 2020 study from the Institute of New Economic Thinking titled, "Profits, Innovation and Financialization in the Insulin Industry," found that the Manufacturer Defendants are still making vast profits from the sale of insulin products regardless of any Manufacturer Payments they are sending back to the PBM Defendants. During the same time when insulin price increases were at their steepest, distributions to the Manufacturers' shareholders in the form of cash dividends and share repurchases totaled *$122 billion*. In fact, during this time period the Manufacturers spent a significantly lower proportion of profits on research and development compared to shareholder payouts.[105]

318.    Further, in January 2021, the U.S. Senate Finance Committee issued a report titled "Insulin: Examining the Factors Driving the Rising Cost of a Century Old Drug" that detailed Congress's findings after reviewing over 100,000 pages of internal company documents from

---

[103] David Balto, *How PBMs make the drug price problem worse*, https://thehill.com/blogs/pundits-blog/healthcare/294025-how-pbms-%20make-the-drug-price-problem-worse/ (last visited March 8, 2024).
[104] Immaculada Hernandez, et al., *Changes in List Prices, Net Prices, and Discounts for Brranded Drugs in the US, 2007-2018,* https://jamanetwork.com/journals/jama/fullarticle/2762310 (last visited March 8, 2024).
[105] Rosie Collington, *Profits, Innovation and Financialization in the Insulin Industry*, https://www.ineteconomics.org/uploads/papers/WP_120-Collington-The-insulin-industry.pdf (last visited March 8, 2024).

Sanofi, Novo Nordisk, Eli Lilly, CVS Caremark, Express Scripts, OptumRx, and Cigna ("Senate Insulin Report"). The Senate Insulin Report concluded, *inter alia*[106]:

- The Manufacturer Defendants retain more revenue from insulin than in the 2000s—for example, Eli Lilly has reported a steady increase in Humalog revenue for more than a decade—from $1.5 billion in 2007 to $3 billion in 2018;

- The Manufacturer Defendants have aggressively raised the reported price of their insulin products absent significant advances in the efficacy of the drugs; and

- The Manufacturer Defendants only spend a fraction of their revenue related to the at-issue drugs on research and development—Eli Lilly spent $395 million on R&D costs for Humalog, Humulin, and Basaglar between 2014- 2018 during which time the company generated $22.4 billion in revenue on these drugs.

319. The truth is—despite their finger pointing in front of Congress—the Manufacturer Defendants and PBM Defendants both intentionally created the Insulin Pricing Scheme.

**G.    Defendants Profit from the Insulin Pricing Scheme**

320. The Insulin Pricing Scheme affords the Manufacturer Defendants the ability to pay the PBM Defendants significant, yet undisclosed, Manufacturer Payments in exchange for formulary placement. That formulary placement garners the Manufacturer Defendants greater revenues from sales, without decreasing their profit margins. During the relevant time period, the PBM Defendants granted national formulary position to each at-issue drug in exchange for large Manufacturer Payments and inflated prices.

321. Because of the increased list prices, and related Manufacturer Payments, the PBM Defendants' profit per prescription has grown exponentially during the relevant time period as well. A recent study published in the Journal of the American Medical Association concluded that the amount of money that goes to the PBM Defendants for each insulin prescription increased over 150% from 2014 to 2018. In fact, for transactions where the PBM Defendants control the PBM and the pharmacy (i.e., Caremark-CVS pharmacy) these Defendants now capture an astonishing 40%

---

[106] *Insulin: Examining the Factors Driving the Rising Cost of a Century Old Drug*, supra note 34.

of the money spent on each insulin prescription (up from only 25% in 2014), despite the fact that they do not contribute to the development, manufacture, innovation or production of the product.[107]

322.    The PBM Defendants profit from the artificially inflated prices created by the Insulin Pricing Scheme in several ways, including (1) retaining a significant, yet undisclosed, percentage of the Manufacturers Payments, (2) using the inflated reported price to generate profits from pharmacies, and (3) relying on the inflated reported price to drive up the PBM Defendants' margins through their own mail-order pharmacies.

 The PBM Defendants Retain a Majority of the Manufacturer Defendants' Undisclosed Payments

323.    The first way in which the PBM Defendants profit off the Insulin Pricing Scheme is by keeping a significant portion of the undisclosed Manufacturer Payments.

324.    The amount that the Manufacturer Defendants pay back to the PBM Defendants has increased over time to represent a large percentage of the reported price of at-issue drugs.

325.    Historically, when the PBM Defendants contracted with payors like Plaintiff, the contract allowed the PBM Defendants to keep all or at least some of the Manufacturer Payments they received, rather than pass them along to the payor.

326.    Over time, payors have secured contract provisions guaranteeing them all or some portion of the "rebates" paid by the Manufacturer Defendants to the PBM Defendants. But— critically— "rebates" are only a portion of the total undisclosed Manufacturer Payments.

327.    The PBM Defendants and the Manufacturer Defendants have created an opaque system where the consideration exchanged between them (and not shared with payors) is labeled

---

[107] Karen Van Nuys, et al., *Estimation of the Share of Net Expenditures on Insulin Captured by US Manufacturers*, *Wholesalers, Pharmacy Benefit Managers, Pharmacies, and Health Plans from 2014 to 2018*, https://jamanetwork.com/journals/jama-health-forum/fullarticle/2785932 (last visited March 8, 2024).

and relabeled. As more payors moved to contracts that required PBMs to pass a majority of the manufacturer "rebates" through to the payor, the PBM Defendants began renaming the Manufacturer Payments in order to retain a larger portion of this money. Payments once known as "rebates" are now called "administrative fees", "volume discounts", "service fees", "inflation fees" or other terms designed to hide the substantial sums being secretly exchanged.

328.    These renamed undisclosed Manufacturer Payments are substantial. A recent heavily redacted complaint filed by Defendant Express Scripts revealed that Express Scripts now retains up to thirteen times more in "administrative fees" than it passes through to payors in formulary rebates.[108]

329.    In addition, the PBM Defendants have come up with numerous methods to hide these renamed Manufacturer Payments in order keep them for themselves.

330.    For example, with regards to the Manufacturer Payments now known as "inflation fees," the PBM Defendants often create a hidden gap between how much the Manufacturer Defendants pay them to increase their prices and the amount in "price protection guarantees" that the PBM Defendants agree to pay back to their client payors.

331.    In particular, the Manufacturer Defendants often pay the PBM Defendants "inflation fees" in order to increase the price of their at-issue drugs. The thresholds for these payments are typically set at around 6% to 8%—if the Manufacturer Defendants raise their prices by more than that percentage during a specified time period, they pay the PBM Defendants an additional "inflation fee" (based on a percentage of the reported prices).

332.    For many of their clients, the PBM Defendants have separate "price protection guarantees" that state that if the overall drug prices for that payor increase by more than a set amount, then the PBM Defendants will revert a portion of that amount back to these clients.

---

[108] *Express Scripts, Inc. v. Kaleo, Inc.*, No. 4:17-cv-01520-RLW (E.D. Mo. 2017).

333.    The PBM Defendants set these "price protection guarantees" at a higher rate than the thresholds that trigger the Manufacturer Defendants' "inflation fees," usually around 10% to 15%.

334.    If the Manufacturer Defendants increase their reported prices more than the 6% to 8% inflation fee rate but less than the 10% to 15% client price protection guarantee rate, then the PBM Defendants keep 100% of these "inflation fee" payments. This is a win-win for the Manufacturer Defendants and the PBM Defendants—they get to mutually retain and share the entire benefit of these price increases.

335.    The PBM Defendants also hide the renamed Manufacturer Payments with entities called "rebate aggregators."

336.    Rebate aggregators, sometimes referred to as rebate group purchasing organizations ("GPOs"), are entities that negotiate for and collect payments from drug manufacturers, including the Manufacturer Defendants, on behalf of a large group of pharmacy benefit managers (including the PBM Defendants) and different entities that contract for pharmaceutical drugs.

337.    These rebate aggregators are often affiliated with or owned by the PBM Defendants, such as Ascent Health Services (Express Scripts), Coalition for Advanced Pharmacy Services and Emisar Pharma Services (OptumRx), and Zinc (CVS Caremark).

338.    Certain rebate-aggregator companies are located offshore. For example, Express Scripts' Ascent Health is in Switzerland (Express Scripts' Ascent Health) and Optum Rx's Emisar Pharma Services is in Ireland, making oversight even more difficult.

339.    During the relevant time period, the PBM Defendants used their controlled rebate aggregator entities to further their conspiracy. The PBM Defendants guard the revenue streams from their rebate aggregator activities, hiding them in complex contractual relationships and not reporting them separately in their quarterly SEC filings.

340.    In testimony before Congress, attorney Jonathan Levitt testified[109]:

[P]ossibly the most significant area of PBM profit arises in the context of manufacturer rebate manipulation.  Similar to spread pricing provisions, PBMs impose misleading or opaque language in the PBM Agreements to allow themselves or an affiliated rebate aggregator to withhold rebate dollars from plan sponsors.  PBMs routinely purport to provide their clients with one hundred percent (100%), but these "pass-through" contract provisions are designed to deceive plan sponsors.  For example, in its contract with Orange County, Optum agreed to provide the Orange County the greater of "100% pass-through of actual Total Rebates" or the minimum guarantees. By limiting the Orange County's entitlement to rebates Optum actually receives, the agreement fails to address portions of rebate dollars retained by Optum's subcontracted or affiliated rebate aggregators.  Each of the three major PBMs, Caremark, Optum, and ESI, have vertically integrated rebate aggregators tasked with administering their rebate programs, making it difficult to grasp the full extent of rebate dollars collected by PBMs and rebate aggregators. PBMs and their subsidiary rebate aggregators carefully guard this revenue to prevent clients from identifying the payment arrangement.  These major PBMs have vertically integrated rebate aggregators including Ascent Health Services (owned by Cigna/ESI), Emisar Pharma Services and Coalition for Advanced Pharmacy Services (owned by UnitedHealth Group/Optum), and Zinc Health Services (owned by CVS Health/Caremark). These rebate aggregators also provide services to other PBMs. For example, Humana and Prime use Ascent Health Services for rebate aggregation. Also, it is worth noting that Ascent Health Services is based out of Switzerland and Emisar Pharma Services is headquartered in Ireland.

341.    For example, a 2017 audit conducted by a local governmental entity on Defendant OptumRx related to its PBM activities from January 1, 2013, until December 31, 2015, concluded that the auditor was unable to verify the percentage of rebates OptumRx passed through to its client payor because OptumRx would not allow the auditor access to its rebate contracts. The audit report explained:

Optum[Rx] has stated that it engaged the services of an aggregator to manage its rebate activity. Optum[Rx] shared that under this model, they are paid by their aggregator a certain amount per prescription referred. Then, the aggregator, through another entity, seeks rebates from the drug manufacturers, based upon the referred [Payor Client] prescription utilization, and retains any rebate amounts that may be received. Optum[Rx] states that they have paid [Payor Client] all amounts it

---

[109]  Jonathan Levitt, *Submitted Written Testimony on: Pharmacy Benefit Managers and the Prescription Drug Supply Chain: Impact on Patients and Taxpayers*, https://www.finance.senate.gov/imo/media/doc/Jonathan%20Levitt%20Testimony%20US%20S enate%20Committee%20on%20Finance%20-%20Frier%20Levitt%20- %20March%202023_Redacted1.pdf (last visited March 8, 2024).

has received from its aggregator, and that they do not have access to the contracts between the aggregator (and its contractors) and the manufacturer. However, our understanding is that Optum[Rx] has an affiliate relationship with its aggregator.[110]

342.    A footnote in the audit report clarifies that "Optum[Rx] contracted with Coalition for Advanced Pharmacy Services (CAPS), and CAPS in turn contracted with Express Scripts, Inc."[111]

343.    In other words, according to this audit report, OptumRx contracts with its own affiliate rebate aggregator, Coalition for Advanced Pharmacy Services, which then contracts with OptumRx's co-conspirator, Express Scripts, which then contracts with the Manufacturers for rebates related to OptumRx's client's drug utilization. OptumRx then uses this complex relationship between itself, its affiliate, and its co-conspirator to obscure the amount of Manufacturer Payments that are being generated from its client's utilization.

344.    During the relevant time period, the PBM Defendants used their controlled rebate aggregator entities to further their conspiracy.

345.    The January 2021 Senate Report summarizing Congress's findings of their two-year probe into the Insulin Pricing Scheme contained the following observation on these rebate aggregators[112]:

> [I]t is noteworthy that industry observers have suggested that the recent partnership between Express Scripts and Prime Therapeutics may serve as a vehicle to avoid increasing legislative and regulatory scrutiny related to administrative fees by channeling such fees through a Swiss-based group purchasing organization (GPO), Ascent Health. While there are several regulatory and legislative efforts underway to prohibit manufacturers from paying administrative fees to PBMs, there is no such effort to change the GPO safe harbor rules. New arrangements used by PBMs to collect fees should be an area of continued investigative interest for Congress.

---

[110] Broward County Florida, Audit of Pharmacy Benefit Management Services Agreement, No. 18-13 (Dec. 7, 2017).
[111] *Id.*
[112] *Insulin: Examining the Factors Driving the Rising Cost of a Century Old Drug, Staff Report*, supra note 34.

346.     Because the PBM Defendants are able to hide (and retain) a majority of the secret Manufacturer Payments that they receive, they are able to make significant profits on the Insulin Pricing Scheme.

347.     Even in the rare cases where certain sophisticated payor clients receive a portion of the Manufacturer Payments from their pharmacy benefit manager (whether it is a PBM Defendant or not), those payors are still significantly overcharged as a direct result of the Insulin Pricing Scheme given the extent to which Defendants have deceptively and egregiously inflated the prices of the at-issue drugs.

<u>The Insulin Pricing Scheme Allows the PBM Defendants to Profit from Pharmacies</u>

348.     The second way that the PBM Defendants benefit from the Insulin Pricing Scheme is by using the Manufacturer Defendants' inflated prices to profit from the pharmacies with whom they contract, including those in St. Louis County.

349.     The PBM Defendants decide which pharmacies are included in their networks and how much they will reimburse these pharmacies for each drug dispensed.

350.     The PBM Defendants pocket the spread between the amount that they get paid by their clients for the at-issue drugs (which are based on the prices generated by the Insulin Pricing Scheme) and the amount the PBM Defendants reimburse the pharmacy, which is often a lower amount.

351.     The PBM Defendants do not disclose to their clients or network pharmacies how much the PBM Defendants receives from one or pays to the other.

352.     This spread pricing, like the undisclosed Manufacturer Payment negotiations, happens behind closed doors. There is no transparency, no commitment from the PBM Defendants to take into account the cost effectiveness of a drug, and no communication to either the payor or the pharmacy to let them know if they are getting a fair deal.

353.    The more the Manufacturer Defendants inflate their prices, the more money the PBM Defendants make from this spread.

The Insulin Pricing Scheme Increases the PBM Defendants' Mail-Order Profits

354.    The third way the PBM Defendants profit from the Insulin Pricing Scheme is through their own mail-order pharmacies. The higher the prices that PBM Defendants charge customers, including Plaintiff, for at-issue drugs, the higher the profits PBM Defendants realize through their mail-order pharmacies.

355.    Because the PBM Defendants base the prices they charge for the at-issue drugs on the Manufacturer Defendants' prices, the more the Manufacturer Defendants inflate their prices, the more money the PBM Defendants make.

356.    For example, the PBM Defendants' conspiracy with the Manufacturer Defendants often allows them to know when the Manufacturer Defendants are going to raise their prices. The PBM Defendants use that information as an opportunity to purchase a significant amount of the at-issue drugs prior to the price increase, at the lower rate. Then, after the Manufacturer Defendants raise their prices, the PBM Defendants charge their mail-order customers based on the higher, increased prices and pocket the difference. The PBM Defendants make significant amounts of money on this scheme.

357.    The PBM Defendants also charge the Manufacturer Defendants fees related to their mail-order pharmacies, such as pharmacy supplemental discount fees, that are directly tied to the Manufacturers' prices. Thus, once again, the higher the prices are, the more money the PBM Defendants make on these fees.

358.    In sum, every way in which the PBM Defendants make money on at-issue drugs is directly tied to creating higher prices and inducing larger secret Manufacturer Payments. The PBM Defendants are not lowering the prices of at-issue drugs as they publicly represent—they are

making billions of dollars by fueling these skyrocketing prices.

**H.    Plaintiff Purchases the At-Issue Drugs from Defendants**

359.    As a government employer, Plaintiff serves its residents by providing public safety, emergency management, and health services, just to name a few of its vital roles. As more federal and state responsibilities are mandated to local government, Plaintiff has a growing list of demands on a limited budget. Consequently, any significant increase in spending can have a severe detrimental effect on Plaintiff's overall budget and, in turn negatively impact its ability to provide necessary services to the community.

360.    One of the benefits Plaintiff provides to its Beneficiaries is paying for a large portion of their pharmaceutical purchases. To provide this benefit, Plaintiff spent millions of dollars on the at-issue drugs during the relevant time period.

361.    To administer its health plan's pharmaceutical program, Plaintiff relies on its PBM as an administrative agent, for the alleged purposes of limiting its administrative burden and controlling pharmaceutical drugs costs.

362.    During the relevant time period, Plaintiff relied on Express Scripts to provide PBM services to its health plan. These PBM services included developing and offering formularies for Plaintiff's prescription plan, constructing and managing Plaintiff's pharmacy network (which included the PBMs' retail and mail order pharmacies), processing pharmacy claims, and providing mail order pharmacy services to Plaintiff.

363.    In providing these services, Express Scripts set the amounts Plaintiff paid in coordination with the Manufacturer Defendants and, utilizing the artificially inflated prices, generated by the Insulin Pricing Scheme. Plaintiff paid Express Scripts for the at-issue drugs.

**I.    Defendants Deceived Plaintiff**

364.    Defendants deceived Plaintiff by failing to disclose the Insulin Pricing Scheme and

the false list prices produced by it.

<div align="center"><u>The Manufacturer Defendants Deceived Plaintiff</u></div>

365.    At all times during the relevant period, the Manufacturer Defendants knew that the prices generated by the Insulin Pricing Scheme were false and untethered to any legal, competitive or fair market price.

366.    The Manufacturer Defendants knew that these prices did not bear a reasonable relationship to the actual prices realized by Defendants, did not result from transparent market forces, and were artificially and arbitrarily inflated for the sole purpose of generating profits for Defendants.

367.    The Manufacturer Defendants also knew that payors, including Plaintiff, relied on the false list prices generated by the Insulin Pricing Scheme to pay for the at-issue drugs.

368.    The Manufacturer Defendants further knew that Plaintiff expected and intended to pay the lowest fair-market prices possible for the at-issue drugs.

369.    The Manufacturer Defendants published the prices generated by the Insulin Pricing Scheme to the PBM Defendants and pharmacies, which used them to charge diabetics and payors, like Plaintiff, for the at-issue drugs.

370.    The Manufacturer Defendants also published the prices generated by the Insulin Pricing Scheme throughout the United States and Missouri through publishing compendia, in various promotional and marketing materials distributed by entities downstream in the drug supply chain and directly to pharmacies, which then used these prices to set the amount that the pharmacies charged for the at-issue drugs.

371.    By publishing their prices throughout Missouri, the Manufacturer Defendants held these prices out as reasonable prices by which to base the prices payors pay for the at-issue drugs.

372.    These representations are false. The Manufacturer Defendants knew that their

<div align="center">75</div>

artificially inflated list prices were not remotely related to the net prices they received for the at-issue drugs, nor were they based on transparent or competitive factors such as cost of production, or research and development.

373. The Manufacturer Defendants also publicly represented that they price the at-issue drugs according to each drug's value to the health care system and the need to fund innovation. For example, briefing materials prepared for CEO Dave Ricks as a panelist at the 2017 Forbes Healthcare Summit included "Reactive Key Messages" on pricing that emphasized the significant research and development costs for insulin. During the relevant time period, executives from Sanofi and Novo Nordisk also represented that research and development costs were key factors driving the at-issue price increases.[113]

374. These statements are also false. Between 2005 and 2018, Eli Lilly only spent $680 million on research and development costs related to Humalog. During that time period, it earned $31.35 billion in *net* sales. In other words, Eli Lilly made more than 46 times its reported research and development costs on Humalog during this portion of the relevant time period. And Novo Nordisk has spent triple the amount it spends on research and development on stock buyouts and shareholder dividend payouts in recent years.[114]

375. The Manufacturer Defendants affirmatively withheld the truth from payors, including Plaintiff, and specifically made these misrepresentations in furtherance of the Insulin Pricing Scheme and to induce reliance in payors and Plaintiff to purchase their at-issue drugs.

376. The Manufacturer Defendants' artificially inflated list prices furthered the Insulin Pricing Scheme to generate profits for the Manufacturer Defendants and the PBM Defendants.

<u>The PBM Defendants Deceived Plaintiff</u>

[113] Committee on Oversight and Reform, Majority Staff Report, *Drug Pricing Investigation,* https://oversightdemocrats.house.gov/sites/democrats.oversight.house.gov/files/DRUG%20PRICING%20REPORT%20WITH%20APPENDIX%20v3.pdf (last visited March 8, 2024).
[114] *Id.*

76

377. The PBM Defendants ensured that the Manufacturer Defendants' artificially inflated list prices harmed diabetics and payors by selecting the highest priced at-issue drugs for preferred formulary placement, and by requiring that their contracts with both pharmacies and payors include such prices as the basis for payment.

378. The PBM Defendants perpetuate the use of artificially inflated insulin prices because it allows them to obscure the actual prices any entity in the drug pricing chain is paying for the at-issue drugs. This lack of transparency affords Defendants the opportunity to construct and perpetuate the Insulin Pricing Scheme, and to profit therefrom at the expense of payors, including St. Louis County.

379. During the relevant period, the PBM Defendants purposefully, consistently and routinely misrepresented that they negotiate with Manufacturer Defendants for lower prices and construct formularies for the benefit of payors and patients by lowering the price of the at-issue drugs, including the following:

- Defendant CVS Caremark has consistently represented in its annual reports that its design and administration of formularies are aimed at reducing the costs and improving the safety, effectiveness and convenience of prescription drugs.

- Defendant CVS Caremark has consistently represented in its annual reports that it maintains an independent panel of doctors, pharmacists and other medical experts to review and approve the selection of drugs based on safety and efficacy for inclusion on one of Caremark's template formularies and that CVS Caremark's formularies lower the cost of drugs.

- Defendant Express Scripts has consistently represented in its annual reports that it works with clients, manufacturers, pharmacists and physicians to increase efficiency in the drug distribution chain, to manage costs in the pharmacy benefit chain and to improve members' health outcomes.

- Defendant Express Scripts has consistently represented in its annual reports that in making formulary recommendations, Express Scripts' Pharmacy & Therapeutics Committee considers the drug's safety and efficacy, without any information on or consideration of the cost of the drug, including any discount or rebate arrangement that Express Scripts negotiates with the Manufacturer, and that Express Scripts fully complies with the P&T Committee's clinical recommendations regarding drugs that must be

77

included or excluded from the formulary based on their assessment of safety and efficacy.

- Defendant Optum Rx has consistently represented in its annual reports that OptumRx's rebate contracting and formulary management assist customers in achieving a low-cost, high-quality pharmacy benefit.

- Defendant Optum Rx has consistently represented in its annual reports that it promotes lower costs by using formulary programs to produce better unit costs, encouraging patients to use drugs that offer improved value and that OptumRx's formularies are selected for health plans based on their safety, cost and effectiveness.

380. In addition to these general misrepresentations, throughout the relevant time period, the PBM Defendants purposefully, consistently, and routinely made misrepresentations regarding at-issue drugs, including the following:

- In a public statement issued in November 2010, CVS Caremark represented that its PBM Pharmacy Advisor program, to be offered to CVS's PBM clients, would allow employers to save nearly $600 per member with diabetes, and that a PBM client with 50,000 employees whose population has an average prevalence of diabetes could save approximately $3.3 million a year.[115]

- In a public statement issued in November 2012, CVS Caremark represented that formulary decisions related to insulin products are "one way the company helps manage costs for clients."[116]

- In 2016, Glen Stettin, Senior Vice President and Chief Innovation Officer at Express Scripts represented in an interview with a national publication that "[d]iabetes is wreaking havoc on patients, and it is also a runaway driver of costs for payors . . . [Express Scripts] helps our clients and diabetes patients prevail over cost and care challenges created by this terrible disease."[117]

- Stettin continued on to represent that Express Scripts intended to "broaden insulin options for patients and bend down the cost curve of what is currently the costliest class of traditional prescription drugs."[118]

---

[115] Chain Drug Review, *CVS expands ExtraCare for diabetes products*, https://www.chaindrugreview.com/cvs-expands-extracare-for-diabetes-products/ (last visited March 8, 2024).
[116] Jon Kamp and Peter Loftus, *CVS' PBM Business Names Drugs It Plans to Block Next Year,* https://www.wsj.com/articles/SB10001424127887324439804578107040729812454 (last visited March 8, 2024).
[117] Express Scripts, *Express Scripts Launches Diabetes Care Value Program, Guaranteeing More Affordable, Higher-Quality Diabetes Care*, https://www.prnewswire.com/news-releases/express-scripts-launches-diabetes-care-value-program-guaranteeing-more-affordable-higher-quality-diabetes-care-300320485.html (last visited March 8, 2024).
[118] *Id.*

- In a 2018 Healthline interview, in response to a question about PBM Defendants' role in the insulin pricing system, Mark Merritt, President of the PBM trade association PCMA, stated that the PBMs he represents are continuing to leverage their formulary to obtain greater discounts.[119]

- During the April 2019 hearings, Thomas M. Moriarty, CVS Caremark's Chief Policy and External Affairs Officer, testified that CVS Caremark "has taken a number of steps to address the impact of insulin price increases: We negotiate the best possible discounts off the manufacturers' price on behalf of employers, unions, government programs, and beneficiaries that we serve."[120]

- Also in the April 2019 hearings, John M. Price, Chief Executive Officer of OptumRx, testified that "[w]e negotiate substantial discounts from drug manufacturers on behalf of our customers. And we are leading the way to ensure that those discounts directly benefit consumers."[121]

- The P C M A   w e b s i t e contains the misrepresentation that, "Insulin prices are high because there are only a few insulin manufacturers, shielded from competition, and those companies set and raise prices. PBMs, on the other hand, are the only entity in the prescription drug supply and payment chain dedicated to reducing drug costs."[122]

381.  The PBM Defendants not only falsely represent that they negotiate with the Manufacturer Defendants to lower the price of the at-issue drugs for *payors*, but also for diabetic *patients* as well. Representative examples include:

- Express Scripts' publicly available Code of Conduct states, "[a]t Express Scripts we're dedicated to keeping our promises to *patients and clients . . .* This commitment defines our culture, and all our collective efforts are focused on our mission to make the use of prescription drugs safer and more affordable." (Emphasis added.)[123]

---

[119] Dave Muoio, *Insulin Prices: Are PBMs and Insurers Doing Their Part?* https://www.hmpgloballearningnetwork.com/site/frmc/article/insulin-prices-are-pbms-and-insurers-doing-their-part (last visited March 8, 2024).

[120] *Testimony of Thomas M. Moriarty, Executive Vice President, Chief Policy and External Affairs Officer, and General Counsel for CVS Health*, https://www.congress.gov/116/meeting/house/109299/witnesses/HHRG-116-IF02-Wstate-MoriartyT-20190410.pdf (last visited March 8, 2024).

[121] *Testimony of John M. Prince, Chief Executive Officer, OptumRx*, https://www.finance.senate.gov/imo/media/doc/John%20Prince%20OptumRx%20Testimony%20Senate%20Finance%20Committee_04.09.19.pdf (last visited March 8, 2024).

[122] PCMA, *PBMs Reduce Insulin Costs*, https://www.pcmanet.org/pbms-reduce-insulin-costs/ (last visited March 8, 2024).

[123] *Express Scripts Code of Conduct*, https://www.express-scripts.com/aboutus/codeconduct/ExpressScriptsCodeOfConduct.pdf (last visited March 8, 2024). .

- Amy Bricker, Senior Vice President at Express Scripts testified before Congress in April 2019, "At Express Scripts we negotiate lower drug prices with drug companies on behalf of our clients, *generating savings that are returned to patients* in the form of lower premiums and reduced out-of-pocket costs." (Emphasis added.)[124]

- Bricker also testified at the Congressional hearing that "Express Scripts remains committed to . . . *patients* with diabetes and creating affordable access to their medications." (Emphasis added.)[125]

- OptumRx has stated that its "pharmacy care services business is achieving better *health outcomes for patients* [and] lowering costs for the system", that "Optum Rx negotiates better prices with drug manufacturers for our customers *and for consumers*", and that "drug manufacturers are solely responsible for the high cost of prescription drugs". (Emphasis added.)[126]

- In its 2017 Drug Report, CVS Caremark stated that the goal of its pharmacy benefit plans is to ensure "that the cost of a drug is aligned with the value it delivers in terms of *patient* outcomes" and that "in 2018, we are doing even more to help keep drugs affordable with our new Savings *Patients* Money initiative."  (Emphasis added.)

382.   Not only have PBM Defendants intentionally misrepresented that they use their market power to save payors and patients money, but they also specifically, knowingly, and falsely disavowed that their conduct drives prices higher. Representative examples include:

- On an Express Scripts earnings call in February 2017, CEO Tim Wentworth stated: "Drugmakers set prices, and we exist to bring those prices down."[127]

- Larry Merlo, head of CVS Caremark sounded a similar refrain in February 2017: "Any suggestion that PBMs are causing prices to rise is simply erroneous."[128]

- In 2017, Express Scripts' Wentworth went on CBS News to argue that PBMs play no role in rising drug prices, stating that PBMs work to "negotiate with drug companies to get the prices down."[129]

---

[124] *Priced Out Of A Lifesaving Drug: Getting Answers On The Rising Cost Of Insulin*, *supra* note 95.
[125] *Id.*
[126] *Testimony of John M. Prince, Chief Executive Officer, supra* note 121.
[127] Lynn R. Webster, *Who is to blame for skyrocketing drug prices?* https://thehill.com/blogs/pundits-blog/healthcare/344115-who-is-to-blame-for-skyrocketing-drug-prices/ (last visited March 8, 2024).
[128] *Id.*
[129] CBS News, *Express Scripts CEO Tim Wentworth defends role of PBMs in drug prices*, https://www.cbsnews.com/news/express-scripts-tim-wentworth-pbm-rising-drug-prices-mylan-epipen-heather-bresh/ (last visited March 8, 2024).

- During the April 2019 Congressional hearings, when asked if PBM-negotiated rebates and discounts were causing the insulin price to increase, OptumRx's Chief Medical Officer answered, "we can't see a correlation just when rebates raise list prices."[130]

- In 2019, when testifying under oath before Congress on the rising price of insulins, Senior Vice President Bricker of Express Scripts testified, "I have no idea why the prices [for insulin] are high and it's not a result of rebate."[131]

383.    Throughout the relevant time period, the PBM Defendants consistently and repeatedly represented that: (1) their interests are aligned with their payor clients; (2) they work to lower the prices of the at-issue drugs and, in doing so, they achieve substantial savings for diabetics and payors; and (3) the Manufacturer Payments that the PBM Defendants receive and the PBM Defendants' formulary construction is for the benefit of patients and payors and is consistent, and in accordance with, their payor clients' interests of reducing drug costs and improving the health of their beneficiaries.

384.    The PBM Defendants understand that payors, including Plaintiff, rely on them to achieve the lowest prices for the at-issue drugs and to construct formularies designed to improve their health.

385.    Throughout the relevant time period, the PBM Defendants also misrepresented that they are transparent about the Manufacturer Payments they receive and pass along (or do not pass along) to payors. As stated above, this representation is false—the PBM Defendants retain many times more in total Manufacturer Payments than the traditional formulary "rebates" they may pass through— in whole or part—to payors.

386.    Despite this, in 2011, OptumRx's President stated: "We want our clients to fully understand our pricing structure . . . [e]veryday we strive to show our commitment to our clients,

---

[130] *Priced Out of a Lifesaving Drug: Getting Answers on the Rising Cost of Insulin*, *supra* note 95.
[131] *Id.*

and one element of that commitment is to be open and honest about our pricing structure."[132]

387.    In a 2017 CBS News interview, Express Scripts' CEO represented, among other things, that Express Scripts supports "absolute transparency" about rebates they receive and that when they obtain rebates, they "flow through [Express Scripts], 100 percent of the time our clients determine where it goes".[133]

388.    When testifying before Congress in April 2019, Express Scripts Senior Vice President Bricker had the following exchange with Representative John Sarbanes of Maryland regarding the transparency (and lack thereof) of the Manufacturer Payments:[134]

> Ms. Bricker. The rebate system is 100 percent transparent to the plan sponsors and the customers that we service. To the people that hire us, employers of America, the government, health plans, what we negotiate for them is transparent to them. . . [However] the reason I'm able to get the discounts that I can from the manufacturer is because it's confidential [to the public].
>
> Mr. Sarbanes. What about if we made it completely transparent? Who would be for that?
>
> Ms. Bricker. Absolutely not . . . it will hurt the consumer.
>
> Mr. Sarbanes. I don't buy it.
>
> Ms. Bricker – prices will be held high.
>
> Mr. Sarbanes. I am not buying it. I think a system has been built that allows for gaming to go on and you have all got your talking points. Ms. Tregoning [of Sanofi], you have said you want to guarantee patient access and affordability at least ten times, which is great, but there is a collaboration going on here . . . the system is working for both of you at the expense of the patient. Now I reserve most of my frustration for the moment in this setting for the PBMs, because I think the lack of transparency is allowing for a lot of manipulation. I think the rebate system is totally screwed up, that without transparency there is opportunity for a lot of hocus-pocus

---

[132] *UNITEDHEALTH GRP : Prescription Solutions by OptumRx Receives 4th Consecutive TIPPSSM Certification for Pharmacy Benefits Transparency Standards*, https://www.marketscreener.com/quote/stock/UNITEDHEALTH-GROUP-INC-14750/news/UNITEDHEALTH-GRP-Prescription-Solutions-by-OptumRx-Receives-4th-Consecutive-TIPPSSM-Certification-13795001/ (last visited March 8, 2024).
[133] *Express Scripts CEO Tim Wentworth defends role of PBMs in drug prices*, *supra* note 129.
[134] *Priced Out of a Lifesaving Drug: Getting Answers on the Rising Cost of Insulin*, *supra* note 95.

to go on with the rebates. Because the list price ends up being unreal in certain ways except to the extent that it leaves certain patients holding the bag, then the rebate is negotiated, but we don't know exactly what happens when the rebate is exchanged in terms of who ultimately benefits from that. And I think we need more transparency and I do not buy the argument that the patient is going to be worse off, the consumer is going to be worse off if we have absolute transparency . . . *I know when you started out, I understand what the mission was originally with the PBMs . . . But now things have gotten out of control. You are too big and the lack of transparency allows you to manipulate the system at the expense of the patients.* So I don't buy the argument that the patient and consumer is going to get hurt if we have absolute transparency.

(Emphasis added.)

389.    During the relevant time period, each PBM Defendant represented that it constructs formularies and negotiates with the Manufacturer Defendants for the benefit of payors and patients by lowering the price of the at-issue drugs and by promoting the health of diabetics.

390.    Throughout the relevant period, the PBM Defendants made the foregoing misrepresentations consistently and directly to Missouri payors, including Plaintiff's Beneficiaries, through member communications, formulary change notifications, and through extensive direct-to-consumer pull through efforts engaged in with the Manufacturers.

391.    All these representations are patently false—the Manufacturer Defendants' and PBM Defendants' coordinated conduct in publishing their prices and negotiating for and constructing their formularies created the Insulin Pricing Scheme and caused the price of the at-issue drugs to skyrocket.

392.    In contrast, patients and payors in both Europe and Canada pay significantly less for their at-issue drugs than patients in the United States who are affected by the Insulin Pricing Scheme. In 2018, the US spent $28 billion (USD) on insulin compared with $484 million in Canada. The average American insulin user spent $3,490 on insulin in 2018 compared with $725 among

Canadians.[135]

393.   Diabetics who receive their medications from federal programs that do not utilize PBMs also pay significantly less. For example, in September 2021, the United States House of Representatives Committee on Oversight and Reform issued a Drug Pricing Investigation Report finding that federal health care programs that negotiate directly with the Manufacturers (such as the Department of Veterans Affairs), and thus are outside the PBM Defendants' scheme, paid $16.7 billion less from 2011 through 2017 for the at-issue drugs than the Medicare Part D program which relies on the PBM Defendants to set their at-issue drug prices (and thus are victims of the PBMs' concerted efforts to drive up the list prices).[136]

394.   Defendants knew that these representations were false when they made them and affirmatively withheld this truth from Plaintiff.

395.   Defendants concealed the falsity of these representations by closely guarding their pricing structures, agreements, and sales figures.

396.   The Manufacturer Defendants do not disclose to payors or the public the actual prices they receive for the at-issue drugs or the amounts in Manufacturer Payments they offer to and pay to the PBM Defendants.

397.   The PBM Defendants do not disclose the details of their agreements with the Manufacturer Defendants or the Manufacturer Payments they receive from them—nor do they

---

[135] Tyler Schneider, et al., *Comparisons of Insulin Spending and Price Between Canada and the United States*,
https://pubmed.ncbi.nlm.nih.gov/35135692/ (last visited March 8, 2024).
[136] Staff Report, Committee on Oversight and Reform, U.S. House of Representatives, *Drug Pricing Investigation, Lost Savings: How Prohibiting Medicare Negotiations Has Cost Taxpayers*,
https://oversightdemocrats.house.gov/sites/democrats.oversight.house.gov/files/COR%20Staff%20Report--Lost%20Savings%20-%20How%20Prohibiting%20Medicare%20Negotiation%20Has%20Cost%20Taxpayers.pdf (last visited March 8, 2024).

disclose the details related to their agreements with payors and pharmacies.

398.     Further, the PBM Defendants' agreements with their clients regarding how much of the Manufacturer Payments they will pass through to their clients are negotiated in an aggregate amount over all drugs purchased, not on an individual drug-by-drug basis. Thus, payors, like Plaintiff, have no way of determining how much of the Manufacturer Payments they receive for any particular drug. This system allows the PBM Defendants to hide the large Manufacturer Payments that they receive for the at-issue drugs.

399.     Even when audited by payors, the PBM Defendants often still refuse to disclose their agreements with the Manufacturer Defendants and pharmacies, relying on overly broad confidentiality agreements, claims of trade secrets, and other unnecessary restrictions.[137]

400.     To make matters worse, diabetic Beneficiaries of Plaintiff's health plans, institutions, and programs, have no choice but to pay Defendants' egregiously inflated prices because they need these medications to survive, and the Manufacturer Defendants make virtually all at-issue drugs available in the U.S.

401.     In sum, the entire insulin pricing structure created by Defendants—from the artificially inflated prices to the Manufacturer Defendants' misrepresentations related to the reason behind the price, to the inclusion of the artificially inflated prices in payor contracts, to the non-transparent Manufacturer Payments, to the misuse of formularies, to the PBM Defendants' representations that they work to lower prices and promote the health of diabetics—is unconscionable and deceptive.

402.     Plaintiff relied on these misrepresentations in paying for the at-issue drugs at Defendants' egregiously inflated prices.

---

[137] Broward County Florida, Audit of Pharmacy Benefit Management Services Agreement, No. 18-13 (Dec. 7, 2017), *supra* note 110.

85

403.    Plaintiff did not know, because Defendants affirmatively concealed, that (i) the list prices were artificially inflated; (ii) the list prices were manipulated to satisfy PBM Defendants' profit demands; (iii) the list prices bore no relationship to the prices paid for the at-issue drugs as they were sold to the PBM Defendants; and (iv) that the entire insulin pricing structure Defendants created was false.

**J.    The Insulin Pricing Scheme Damaged, and Continues to Damage, Plaintiff**

404.    Since at least 2014, Plaintiff has engaged in business with Defendants for the at-issue drugs.

405.    In October 2014, Plaintiff entered into an agreement with Express Scripts, whereby Express Scripts agreed to provide Plaintiff prescription drug benefits and other at-issue services.

406.    Plaintiff was unaware of the Insulin Pricing Scheme. Plaintiff relied on Defendants' public statements and material omissions.

407.    Defendants' Insulin Pricing Scheme has cost Plaintiff millions of dollars in overcharges.

408.    Indeed, since 2014, Plaintiff has spent more than $11.97 million on the at-issue drugs.

409.    Plaintiff was directly damaged, and continues to be damaged, by the Insulin Pricing Scheme as a payor/purchaser of Defendants' at-issue drugs.

410.    A substantial portion of this $11.97 million is attributable to Defendants' inflated prices, which did not arise from competitive market forces. Instead, the artificially inflated costs are the intended result of Defendants' Insulin Pricing Scheme.

411.    As an employer, Plaintiff provides health benefits to its Beneficiaries, including employees, retirees, and their dependents.

412.    One of the benefits that Plaintiff offers its Beneficiaries through its employee health

86

plan is payment of a significant portion of the Beneficiaries' prescription drug purchases.

413.    Importantly, because of Defendants' success in hiding the Insulin Pricing Scheme, no payor, including Plaintiff, knows (or could know) that the prices for the at-issue drugs are generated by Defendants' scheme and are artificially inflated.

414.    As a result, despite paying a negotiated discount off the reported price, Plaintiff has been unknowingly overpaying for the Manufacturer Defendants' at-issue drugs by millions of dollars.

415.    Thus, the Insulin Pricing Scheme has directly and proximately caused Plaintiff to substantially overpay for at-issue drugs.

416.    Because Defendants continue to generate exorbitant, unfair and deceptive prices for the at-issue drugs through the Insulin Pricing Scheme, the harm to Plaintiff is ongoing.

**K.    Defendants' Recent Efforts in Response to Rising Insulin Prices**

417.    In reaction to mounting political and public criticism, Defendants took action both on Capitol Hill and in public relations campaigns.

418.    First, in response to public criticism, Defendants increased their spending to spread their influence in Washington D.C.

419.    For example, in recent years, Novo Nordisk's political action committee ("PAC") doubled its spending on federal campaign donations and lobbying efforts. In 2017 alone, Novo Nordisk spent $3.2 million lobbying Congress and federal agencies, its biggest ever investment in directly influencing U.S. policymakers. Eli Lilly and Sanofi have similarly contributed millions of dollars through their PACs in recent years.[138]

420.    Likewise, the PBM Defendants have steadily increased their political spending as

---

[138] Jay Hancock and Elizabeth Lucas, *How a drug company under pressure for high prices ratchets up political activity*, https://www.statnews.com/2018/04/30/novo-nordisk-high-drug-prices-political-activity/ (last visited March 8, 2024).

public outcry has grown against them.

421.    Second, Defendants recently began publicizing programs ostensibly aimed at lowering the cost of insulins. But these affordability measures fail to address the structural issues that gave rise to the price hikes. Rather, these are mere public relations stunts that do not solve the problem.

422.    For example, in March 2019, Defendant Eli Lilly announced that it would produce an authorized generic version of Humalog, "Insulin Lispro," and promised that it would "work quickly with supply chain partners to make [the authorized generic] available in pharmacies as quickly as possible."

423.    However, in the months after Eli Lilly's announcement, reports raised questions about the availability of "Insulin Lispro" in local pharmacies.

424.    As a result, the staff of the Offices of U.S. Senators Elizabeth Warren and Richard Blumenthal prepared a report examining the availability of this drug. The investigative report, *Inaccessible Insulin: The Broken Promise of Eli Lilly's Authorized Generic*, concluded that Eli Lilly's lower-priced, authorized generic insulin is widely unavailable in pharmacies across the country, and that the company has not taken meaningful steps to increase insulin accessibility and affordability.[139]

425.    The conclusion of the report was that: "Eli Lilly has failed to deliver on its promise to put a more-affordable insulin product on the shelves. Instead of giving patients access   to   its generic   alternative,   this   pharmaceutical   behemoth   is   still   charging astronomical prices for

---

[139] Offices of U.S. Senator Elizabeth Warren and U.S. Senator Richard Blumenthal, *Inaccessible Insulin: The Broken Promise of Eli Lilly's Authorized Generic,* https://www.warren.senate.gov/imo/media/doc/Inaccessible%20Insulin%20report.pdf  (last visited March 8, 2024).

a drug people require daily and cannot live without."[140]

426.    In 2019, Novo Nordisk partnered with Walmart to offer ReliOn brand insulins for a discounted price at Walmart. However, experts have warned that the Walmart/Novo Nordisk insulins are not substitutes for most diabetics' regular insulins and should only be used in an emergency or when traveling. In particular, for many diabetics, especially Type 1 diabetics, these insulins can be dangerous.

427.    In fact, in August 2019, a Type 1 diabetic who could no longer afford his $1,200 a month insulin prescription died months after switching to ReliOn brand insulin due to complications from the disease.[141]

428.    Thus, Defendants' "lower priced" insulin campaigns failed to resolve the problem. Plaintiff continues to suffer great harm as a result of the Insulin Pricing Scheme.

## V.    TOLLING OF THE STATUTES OF LIMITATIONS

429.    Plaintiff has diligently pursued and investigated the claims asserted in this Complaint. Through no fault of its own, Plaintiff did not learn, and could not have learned, of the factual bases for its claims or the injuries suffered therefrom until recently. Consequently, the following tolling doctrines apply.

### A.    Discovery Rule Tolling

430.    Plaintiff had no way of knowing about the Insulin Pricing Scheme.

431.    As discussed above, the PBM Defendants and the Manufacturer Defendants refused

---

[140] *Senators Warren and Blumenthal Release Investigation Revealing Diabetes Patients' Lack of Access to Lower-Priced Insulin,*
https://www.warren.senate.gov/oversight/reports/senators-warren-and-blumenthal-release-investigation-revealing-diabetes-patients-lack-of-access-to-lower-priced-insulin (last visited March 8, 2024).

[141] Joshua Bote, *A man who switched to more affordable insulin died. Here's what happened in the viral story,*
https://www.usatoday.com/story/news/nation/2019/08/09/man-dies-otc-insulin/1942908001/ (last visited March 8, 2024).

to disclose the actual prices of at-issue drugs realized by Defendants or the details of Defendants'

negotiations and payments between each other, or their pricing structures and agreements, labeling

them trade secrets and protecting them with confidentiality agreements.

432.    Each Defendant group also affirmatively blamed the other for the price increases

described herein, both during their Congressional testimonies and through the media.

433.    Plaintiff did not discover, and did not know of, facts that would have caused a

reasonable person to suspect that Defendants were engaged in the Insulin Pricing Scheme, nor would

a reasonable and diligent investigation have disclosed the true facts.

434.    Even today, lack of transparency in insulin medication pricing and the

arrangements, relationships, and agreements between and among the Manufacturer Defendants

and the PBM Defendants continue to obscure Defendants' unlawful conduct from Plaintiff and the

general public.

435.    For these reasons, all applicable statutes of limitation have been tolled by operation

of the discovery rule with respect to claims identified herein.

**B.     Fraudulent Concealment Tolling**

436.    Any applicable statutes of limitation have also been tolled by Defendants' knowing

and active fraudulent concealment and denial of the facts alleged herein throughout the relevant

period, as set forth above.

**C.     Estoppel**

437.    Defendants were under a continuous duty to disclose to Plaintiff the true character,

quality and nature of the prices upon which payments for at-issue drugs were based, and the true

nature of the services being provided.

438.    Based on the foregoing, Defendants are estopped from relying on any statutes of

limitations in defense of this action.

**D.      Continuing Violations**

439.     Any applicable statutes of limitations are also tolled because Defendants' activities have not ceased and continue to the present day, such that their individual and concerted acts and omissions constitute a series of continuing wrongs and, therefore any causes of action are not complete and do not accrue until the tortious and anticompetitive acts have ceased.

## VI.      CLAIMS FOR RELIEF

### First Cause of Action (Count I)

**Violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c)**

(against Defendants Eli Lilly, Novo Nordisk, Sanofi, and Express Scripts)

440.     Plaintiff re-alleges and incorporates herein by reference each of the allegations from paragraph 1 through paragraph 439.

441.     This cause of action is brought by Plaintiff against Eli Lilly, Novo Nordisk, Sanofi, and Express Scripts for violations of 18 U.S.C. § 1962(c).

442.     Defendants Eli Lilly, Novo Nordisk, Sanofi, and Express Scripts are (a) culpable "persons" who (b) willfully and knowingly (c) committed and conspired to commit two or more acts of mail and wire fraud (d) through a "pattern" of racketeering activity (e) involving an "association in fact" enterprise (f) the results of which had an effect on interstate commerce.

**A.      Defendants Are Culpable "Persons" Under RICO**

443.     Defendants Eli Lilly, Novo Nordisk, Sanofi, and Express Scripts, each separately, are "persons" as that term is defined in 18 U.S.C. § 1961(3) because each is capable of holding a legal or beneficial interest in property.

444.     Each of Defendants Eli Lilly, Novo Nordisk, Sanofi, and Express Scripts are separate entities and "persons" that are distinct from the RICO enterprises alleged below.

**B.      The Manufacturer-PBM RICO Enterprises**

445.     For the purposes of this claim, the RICO enterprises are six separate associations-in-fact consisting of Express Scripts and one of each of the Manufacturer Defendants, including those entities' directors, employees, and agents:

- The "Eli Lilly-PBM Enterprise" is an association-in-fact consisting of Express Scripts and Eli Lilly. The Eli Lilly-PBM Enterprise is associated for the common and/or shared purposes of manufacturing, selling and facilitating the purchase of Humulin N, Humulin R, Humalog, Trulicity, and Basaglar.

- The "Novo Nordisk-PBM Enterprise" is an association-in-fact consisting of Express Scripts and Novo Nordisk. The Novo Nordisk-PBM Enterprise is associated for the common and/or shared purposes of manufacturing, selling and facilitating the purchase of Novolin R, Novolin N, Novolog, Levemir, Tresiba, Victoza, and Ozempic.

- The "Sanofi-PBM Enterprises" is a separate associations-in-fact consisting of Express Scripts and Sanofi. The Sanofi-PBM Enterprise is associated for the common and/or shared purposes of manufacturing, selling and facilitating the purchase of Lantus, Toujeo, Apidra, and Soliqua.

446.     These associations-in-fact enterprises are collectively referred to herein as the "Manufacturer-PBM Enterprises."

447.     Each Manufacturer-PBM Enterprise is a separate, ongoing, and continuing business organization consisting of both corporations and individuals that are and have been associated for the common and/or shared purposes of manufacturing, selling, and facilitating the purchase of the at-issue drugs.

448.     With respect to the Insulin Pricing Scheme, each Manufacturer-PBM Enterprise engaged in the shared purposes of exchanging false list prices and secret Manufacturer Payments for preferred formulary positions for the at-issue drugs in order to profit off diabetics and payors, including Plaintiff.

449.     Each of the Manufacturer-PBM Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Eli Lilly and Express Scripts, Novo Nordisk and Express Scripts, and Sanofi and Express Scripts.

450.    As to each of these Manufacturer-PBM Enterprises, there is a common communication network by which Eli Lilly and Express Scripts, Novo Nordisk and Express Scripts, and Sanofi and Express Scripts share information and meet on a regular basis. These communications include those that relate to the use of the false list prices for the at-issue drugs and the regular flow of Manufacturer Payments from each Manufacturer Defendant to Express Scripts for formulary placement.

451.    Each Defendant within the Manufacturer-PBM Enterprises functions as continuing but separate unit.

452.    During the relevant period, each of the Manufacturer-PBM Enterprises was operated and conducted for unlawful purposes by each Manufacturer Defendant and Express Scripts, namely, carrying out the Insulin Pricing Scheme.

453.    From these activities, each Manufacturer-PBM Enterprise derived secret profits that are greater than any one of the Manufacturer Defendants or Express Scripts could obtain absent their misrepresentations regarding their non-transparent pricing schemes.

454.    To accomplish this common purpose, each Manufacturer Defendant periodically and systematically inflated the prices of the at-issue drugs and then secretly paid a significant, yet undisclosed, portion of this inflated price back to Express Scripts in the form of Manufacturer Payments.

455.    Each Manufacturer-PBM Enterprise did so willfully and with knowledge that Plaintiff paid for the at-issue drugs at prices directly based on the false list prices.

456.    Each Manufacturer-PBM Enterprise's inflation of the list prices and secret Manufacturer Payments were a *quid pro quo* exchange for preferred formulary placement.

457.    Each Manufacturer-PBM Enterprise concealed from Plaintiff that these artificially inflated prices and secret Manufacturer Payments resulted in each Manufacturer Defendant gaining

formulary access without requiring significant price reductions; and they resulted in higher profits for Express Scripts, whose earnings increased with price inflation and the increased payments from each Manufacturer Defendant.

458.     Each Manufacturer-PBM Enterprise also shares a common purpose of perpetuating the use of the false list prices for the at-issue drugs as the basis for the price that payors, including Plaintiff, and diabetics pay for at-issue drugs.

459.     The Manufacturer Defendants would not be able to offer large pricing spreads to Express Scripts in exchange for favorable formulary positions without the use of the false list prices as the basis for the prices paid by diabetics and payors, including Plaintiff, for the at-issue drugs.

460.     Express Scripts shares this common purpose because nearly all of their profit and revenue that is generated from the at-issue drugs is tied to the false inflated prices generated by the Insulin Pricing Scheme. Without diabetics and payors, including Plaintiff, paying for at-issue drugs based on the inflated list prices, their profits from the Insulin Pricing Scheme would decrease.

461.     As a result, Express Scripts has, with the knowing and willful participation and assistance of each Manufacturer Defendant, engaged in hidden profit-making schemes falling into four general categories: (i) garnering undisclosed Manufacturer Payments from each Manufacturer Defendant that Express Scripts retains to a large extent; (ii) generating substantial profits from pharmacies because of the falsely inflated prices; (iii) generating profits on the at-issue drugs sold through Express Scripts' own mail order and retail pharmacies and (iv) keeping the discounts each Manufacturer Defendant provides in association with Express Scripts' mail order and retail operations a secret.

462.     During the relevant period, Express Scripts and each Manufacturer  Defendant have been aware of their respective  Manufacturer-PBM Enterprise's conduct, have been knowing and willing participants in and coordinators of that conduct and have reaped profits from

that conduct.

463.     In the absence of each Manufacturer-PBM Enterprise's common purpose of engaging in the Insulin Pricing Scheme, each Manufacturer Defendant and Express Scripts would have had the incentive to disclose the fraudulence of the scheme.

464.     By failing to disclose this fraud, each Manufacturer Defendant and Express Scripts perpetuated the conduct of the Manufacturer-PBM Enterprises.

465.     Each Manufacturer-PBM Enterprise knowingly made material misrepresentations to the public and Plaintiff in furtherance of the fraudulent scheme, including publishing inflated prices for insulin, and representing that:

- the false list prices for the at-issue drugs were reasonably related to the actual prices realized by Defendants and were a reasonable and fair basis on which to base the price Plaintiff paid for these drugs;

- each Manufacturer Defendant priced its at-issue drugs according to each drug's value to the healthcare system and the need to fund innovation.

- the Manufacturer Payments paid back to Express Scripts for each at-issue drug was for the benefit of Plaintiff;

- each Manufacturer Defendant and Express Scripts were transparent with Plaintiff regarding the Manufacturer Payments and that these Manufacturer Payments did, in fact, save Plaintiff money; and

- Express Scripts constructed formularies in a manner that lowered the prices of the at-issue drugs and promoted the health and safety of diabetics.

466.     At all times relevant to this Complaint, each Manufacturer-PBM Enterprise knew these representations to be false.

467.     At all times relevant to this Complaint, each Manufacturer-PBM Enterprise intentionally made these representations for the purpose of inducing Plaintiff into paying for at-issue drugs at these false list prices.

468.     Plaintiff relied on the material misrepresentations and omissions made by each

Manufacturer-PBM Enterprise in paying prices for the at-issue drugs based upon the artificially inflated prices generated by Insulin Pricing Scheme.

469.    Neither Express Scripts nor the Manufacturer Defendants alone could have accomplished the purposes of the Manufacturer-PBM Enterprises without the other entities.

470.    Express Scripts needed the Manufacturer Defendants to falsely inflate their published prices and to pay large Manufacturer Payments back to them.

471.    For the Manufacturer Defendants to profit from the scheme, Express Scripts needed to convince Plaintiff to pay prices for the at-issue drugs based upon the false list prices.

472.    Express Scripts did so by utilizing the misrepresentations listed above to convince Plaintiff that it had secured lower prices when, in fact, it did the opposite, all while concealing the Insulin Pricing Scheme.

473.    Without these misrepresentations, each Manufacturer-PBM Enterprise could not have achieved its common purpose, as Plaintiff would not have been willing to pay based upon these false list prices.

474.    The Manufacturer Defendants and Express Scripts were each willing participants in the Manufacturer-PBM Enterprises, had a common fraudulent purpose and interest in the objective of the scheme, and functioned within a structure designed to effectuate the Enterprises' purposes, *i.e.*, to increase profits for each Defendant at the expense of Plaintiff.

**C.    Defendants' Use of the U.S. Mails and Interstate Wire Facilities**

475.    Each of the Manufacturer-PBM Enterprises engaged in and affected interstate commerce because each engaged in the following activities across state boundaries: the sale, purchase and/or administration of at-issue drugs; the setting and publishing of the prices of these drugs; and/or the transmission of pricing information of at-issue drugs; and/or the transmission and/or receipt of sales and marketing literature; and/or the transmission of at-issue drugs through

mail-order and retail pharmacies; and/or the transmission and/or receipt of invoices, statements, and payments related to the use or administration of at-issue drugs; and/or the negotiations and transmissions of contracts related to the pricing of and payment for at-issue drugs.

476.    Each Manufacturer-PBM Enterprise participated in the administration of at-issue drugs to millions of individuals located throughout the United States, including in St. Louis County and elsewhere in this District.

477.    Each Manufacturer Defendant and Express Scripts' illegal conduct and wrongful practices were carried out by an array of employees, working across state boundaries, who necessarily relied upon frequent transfers of documents, information, products and funds through the U.S. mails and interstate wire facilities.

478.    The nature and pervasiveness of the Insulin Pricing Scheme, which included each Manufacturer Defendant's and Express Scripts corporate headquarters operations, necessarily required those headquarters to communicate directly and frequently by the U.S. mails and by interstate wire facilities with each other and with pharmacies, physicians, payors and diabetics in St. Louis County and throughout Missouri.

479.    Some of the precise dates of each Manufacturer-PBM Enterprise's uses of the U.S. mails and interstate wire facilities (and corresponding RICO predicate acts of mail and wire fraud) have been hidden and cannot be alleged without access to each entity's books and records. Indeed, an essential part of the successful operation of the Insulin Pricing Scheme depended upon secrecy, as alleged above. And each Manufacturer Defendant and Express Scripts took deliberate steps to conceal its wrongdoing.

480.    Each Manufacturer-PBM Enterprise's use of the U.S. mails and interstate wire facilities to perpetrate the Insulin Pricing Scheme involved thousands of communications including:

- Marketing materials regarding the published prices for at-issue drugs, which each Manufacturer Defendant sent to Express Scripts located across the country, in St. Louis County, and throughout Missouri;

- Written and oral representations of the false list prices of at-issue drugs that each Manufacturer Defendant and Express Scripts made at least annually and, in many cases, several times during a single year to the public;

- Thousands of written and oral communications discussing, negotiating, and confirming the placement of each Manufacturer Defendant's at-issue drugs on Express Scripts' formularies;

- Written and oral representations made by each Manufacturer Defendant regarding information or incentives paid back to each Express Scripts for at-issue drugs sold and/or to conceal these incentives or the Insulin Pricing Scheme;

- Written communications made by each Manufacturer Defendant, including checks, relating to Manufacturer Payments paid to Express Scripts to persuade them to advocate at-issue drugs;

- Written and oral communications with U.S. government agencies that misrepresented what the published prices were or that were intended to deter investigations into the true nature of the published prices of at-issue drugs or to forestall changes to reimbursement based on something other than published prices;

- Written and oral communications with payors, including Plaintiff, regarding the prices of at-issue drugs;

- Written and oral communications to Plaintiff, including marketing and solicitation material sent by Express Scripts regarding the existence, amounts, or purposes of payments made by each Manufacturer Defendant to Express Scripts  for the at-issue drugs and the purpose of Express Scripts' formularies;

- Transmission of published prices to third parties and payors, including Plaintiff; and

- Receipts of money on tens of thousands of occasions through the U.S. mails and interstate wire facilities—the wrongful proceeds of the Insulin Pricing Scheme.

## D.    Conduct of the Manufacturer-PBM Enterprises' Affairs

481.    Each Manufacturer Defendant and Express Scripts has participated in and exerted control over the Manufacturer-PBM Enterprises with which they were associated and, in violation of Section 1962(c) of RICO, each Manufacturer Defendant and Express Scripts has conducted or

participated in the conduct of the affairs of those association-in-fact RICO enterprises, directly or indirectly. Such participation was carried out in the following ways:

- Each Manufacturer Defendant directly controls the secret Manufacturer Payments it provides to Express Scripts for its at-issue drugs.

- Express Scripts directly controls its drug formularies, which determine the utilization of the at-issue drugs.

- Each Manufacturer Defendant directly controls the publication of the false list prices generated by the Insulin Pricing Scheme.

- Each Manufacturer Defendant directly controls the creation and distribution of marketing, sales and other materials used to inform Express Scripts of the profit potential from its at-issue drugs.

- Express Scripts directly controls the creation and distribution of marketing, sales and other materials used to inform payors and the public of the benefits and cost-saving potential of Express Scripts' formularies and negotiations with the Manufacturers.

- Express Scripts and each Manufacturer Defendant have relied upon its employees and agents to promote the Insulin Pricing Scheme through the U.S. mails, through interstate wire facilities and through direct contacts with payors.

- Each Manufacturer Defendant has controlled and participated in the affairs of each Manufacturer-PBM Enterprise by providing Manufacturer Payments and/or other inducements to place the at-issue drugs on Express Scripts' formularies.

- Express Scripts has controlled and participated in the affairs of the Manufacturer-PBM Enterprise with which it is associated by incentivizing and agreeing with each Manufacturer Defendant to exchange formulary placement for false list prices and payments as set forth above. Furthermore, Express Scripts hides the actual amount of secret Manufacturer Payments received from each Manufacturer Defendant by relabeling them discounts, credits, concession fees, administrative fees, etc. and then not disclosing the amount paid under these labels.

- Express Scripts distributed through the U.S. mail and interstate wire facilities, promotional and other materials which claimed that the Manufacturer Payments paid from each Manufacturer Defendant to Express Scripts saved Plaintiff money on the at-issue drugs.

- Each Manufacturer Defendant represented to Plaintiff—by publishing and promoting false list prices without stating that these published prices differed substantially from the prices realized by each Manufacturer Defendant and Express Scripts—that the published prices of at-issue drugs reflected or approximated the actual prices realized by Defendants and resulted from transparent and competitive, fair market forces.

- Each of the Manufacturer-PBM Enterprises identified above had a hierarchical decision-making structure headed by each Manufacturer Defendant and Express Scripts.

- In violation of Section 1962(c) of RICO, each Manufacturer Defendant and Express Scripts have conducted the affairs of each of the Manufacturer-PBM Enterprises with which they associated in order to carry out the Insulin Pricing Scheme.

**E.     Defendants' Pattern of Racketeering Activity**

482.    Each Manufacturer Defendant and Express Scripts have conducted and participated in the affairs of their respective Manufacturer-PBM Enterprises through a pattern of racketeering activity, including acts that are unlawful under 18 U.S.C. § 1341, relating to mail fraud, and 18 U.S.C. § 1343, relating to wire fraud.

483.    Each Manufacturer Defendant's and Express Scripts' pattern of racketeering likely involved thousands, if not hundreds of thousands, of separate instances of use of the U.S. mails or interstate wire facilities in furtherance of the Insulin Pricing Scheme set forth above. Each of these fraudulent mailings and interstate wire transmissions constitutes a "racketeering activity" within the meaning of 18 U.S.C. § 1961(1). Collectively, these violations constitute a "pattern of racketeering activity," within the meaning of 18 U.S.C. § 1961(5), in which each Manufacturer Defendant and Express Scripts intended to defraud Plaintiff.

484.    By intentionally and falsely inflating the list prices, by misrepresenting the purpose behind both the Manufacturer Payments made from each Manufacturer Defendant to Express Scripts and Express Scripts' formulary construction, and by subsequently failing to disclose such practices to Plaintiff, each Manufacturer Defendant and Express Scripts engaged in a fraudulent and unlawful course of conduct constituting a pattern of racketeering activity.

485.    Each Manufacturer Defendant's and Express Scripts' racketeering activities amounted to a common course of conduct, with similar patterns and purposes, intended to deceive Plaintiff.

486.    Each separate use of the U.S. mails and/or interstate wire facilities employed by each Manufacturer Defendant and Express Scripts was related, had similar intended purposes, involved similar participants and methods of execution, and had the same results affecting the same victims, including Plaintiff.

487.    Each Manufacturer Defendant and Express Scripts engaged in the pattern of racketeering activity for the purpose of conducting the ongoing business affairs of the respective Manufacturer-PBM Enterprises with which each of them is and was associated in fact.

**F.    Defendants' Motive**

488.    Each Manufacturer Defendant's and Express Scripts' motives in creating and operating the Insulin Pricing Scheme, and conducting the affairs of the Manufacturer-PBM Enterprises described herein, were to falsely obtain sales of and profits from at-issue drugs.

489.    The Insulin Pricing Scheme was designed to, and did, encourage others, including payors such as Plaintiff, to advocate the use of each Manufacturer Defendant's products and to pay for those at-issue drugs based on a falsely inflated price. Each Manufacturer Defendant used the Insulin Pricing Scheme to obtain formulary placement to sell more of its drugs without having to cut into its profits. Express Scripts used the Insulin Pricing Scheme to falsely inflate the price payors such as Plaintiff paid for at-issue drugs in order to profit off the Insulin Pricing Scheme, as discussed above.

**G.    The Manufacturer-PBM Enterprises' Insulin Pricing Scheme Damaged Plaintiff**

490.    Each Manufacturer-PBM Enterprise's violations of federal law and pattern of racketeering activity has directly and proximately caused Plaintiff to be injured in its business or property.

491.    The prices Plaintiff pays for the at-issue drugs is directly tied to the false list prices generated by the Insulin Pricing Scheme.

492.    No other intermediary in the supply chain has control over or is responsible for the list prices on which nearly all Plaintiff's payments are based other than the Manufacturer-PBM Defendant Enterprises.

493.    Defendants collectively set the prices that Plaintiff paid for the at-issue drugs.

494.    During the relevant time period, Express Scripts provided PBM services to Plaintiff and benefitted therefrom.

495.    During the relevant time period, Plaintiff paid Express Scripts for the at-issue drugs.

496.    The entire basis behind each Manufacturer-PBM Enterprise's fraudulent scheme was to convince Plaintiff to pay artificially inflated prices for at-issue drugs in order to reap enormous profits.

497.    Each Manufacturer-PBM Enterprise controlled and participated in the Insulin Pricing Scheme that was directly responsible for the false list prices upon which the prices Plaintiff paid were based.

498.    Thus, Plaintiff was damaged as a result of the Insulin Pricing Scheme. But for the misrepresentations and artificially inflated prices created by the Insulin Pricing Scheme that each Manufacturer-PBM Enterprise employed, Plaintiff would have paid less for at-issue drugs.

499.    As a direct result of the Insulin Pricing Scheme, Plaintiff was further damaged by incurring increased healthcare costs and by losing tax revenue due to decreased workforce productivity.

500.    Plaintiff was directly harmed by the Insulin Pricing Scheme and is entitled to seek a remedy for the harms caused by Defendants' fraudulent scheme.

501.    Plaintiff's damages are separate and distinct from any other victim that was harmed by the Manufacturer-PBM Defendant Enterprises' Insulin Pricing Scheme.

502.    By virtue of these violations of 18 U.S.C. § 1962(c), under the provisions of Section

1964(c) of RICO, Defendants are jointly and severally liable to Plaintiff for three times the damages that were sustained, plus the costs of bringing this suit, including reasonable attorneys' fees.

503.    By virtue of these violations of 18 U.S.C. § 1962(c), under the provisions of Section 1964(a) of RICO, Plaintiff seeks injunctive relief against each Manufacturer and Express Scripts for their fraudulent reporting of their prices and their continuing acts to affirmatively misrepresent and/or conceal and suppress material facts concerning their false and inflated prices for at-issue drugs, plus the costs of bringing this suit, including reasonable attorneys' fees.

504.    Absent an injunction, the effects of this fraudulent, unfair, and unconscionable conduct will continue. Plaintiff continues to purchase the at-issue drugs. Plaintiff will continue to pay based on the Defendants' false list prices. This continuing fraudulent, unfair, and unconscionable conduct is a serious matter that calls for injunctive relief as a remedy. Plaintiff seeks injunctive relief, including an injunction against each Manufacturer Defendant and Express Scripts, to prevent them from affirmatively misrepresenting and/or concealing and suppressing material facts concerning their conduct in furtherance of the Insulin Pricing Scheme.

## Second Cause of Action (Count II)

**Violations of RICO, 18 U.S.C. § 1962(d) By Conspiring to Violate 18 U.S.C. § 1962(c)**
(against All Defendants)

505.    Plaintiff re-alleges and incorporates herein by reference each of the allegations from paragraph 1 through paragraph 439.

506.    Section 1962(d) of RICO provides that it "shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b) or (c) of this section."

507.    Defendants have violated § 1962(d) by agreeing and conspiring to violate 18 U.S.C. § 1962(c). The object of this conspiracy has been and is to conduct or participate in the Insulin Pricing Scheme.

508.     As set forth above, as well as in the Civil Conspiracy claim below, Defendants each knowingly agreed to facilitate the Insulin Pricing Scheme and each has engaged in numerous overt and predicate fraudulent racketeering acts in furtherance of the conspiracy. Specifically, Defendants agreed to and did inflate the prices of the at-issue drugs in lockstep to achieve an unlawful purpose; Defendants agreed to and did make false or misleading statements or material omissions regarding the reasons for these price increases, the purpose of the Manufacturer Payments exchanged between Defendants and the PBM Defendants' formulary construction; and the PBM Defendants agreed to and did, in concert, request and receive larger Manufacturer Payments and higher prices in exchange for formulary placement.

509.     The nature of the above-described Defendant co-conspirators' acts, material misrepresentations, and omissions in furtherance of the conspiracy gives rise to an inference that they not only agreed to the objective of an 18 U.S.C. § 1962(d) violation of RICO by conspiring to violate 18 U.S.C. § 1962(c), but they were aware that their ongoing fraudulent and extortionate acts have been and are part of an overall pattern of racketeering activity.

510.     Defendants have engaged and continue to engage in the commission of overt acts, including the following unlawful racketeering predicate acts:

- Multiple instances of mail fraud in violations of 18 U.S.C. § 1341;

- Multiple instances of wire fraud in violations of 18 U.S.C. § 1343; and

- Multiple instances of unlawful activity in violation of 18 U.S.C. § 1952.

511.     Defendants' conspiracy to violate the above federal laws and the effects thereof detailed above are continuing and will continue. Plaintiff has been injured in its property by reason of these violations: Plaintiff has paid more for the at-issue drugs than it would have but for Defendants' conspiracy to violate 18 U.S.C. § 1962(c).

512.     By virtue of these violations of 18 U.S.C. § 1962(d), Defendants are jointly and

severally liable to Plaintiff for three times the damages Plaintiff has sustained, plus the cost of this suit, including reasonable attorneys' fees.

### Third Cause of Action (Count III)

**Unjust Enrichment**
(against Defendants Eli Lilly, Novo Nordisk, Sanofi, and Express Scripts)

513.    Plaintiff re-alleges and incorporates herein by reference each of the allegations from paragraph 1 through paragraph 439.

514.    This cause of action is alleged in the alternative to any claim Plaintiff may have for legal relief.

515.    Plaintiff conferred a benefit upon Defendants Eli Lilly, Novo Nordisk, Sanofi, and Express Scripts. These Defendants deceived Plaintiff and have received a financial windfall from the Insulin Pricing Scheme at Plaintiff's expense.

516.    These Defendants wrongfully secured and retained unjust benefits from Plaintiff in the form of amounts paid for at-issue drugs and fees and payments collected based on the prices generated by the Insulin Pricing Scheme. They did not adequately compensate Plaintiff therefor.

517.    Defendants Eli Lilly, Novo Nordisk, Sanofi, and Express Scripts were aware of the benefit, voluntarily accepted it, and retained and appreciated the benefit, to which it was not entitled, at Plaintiff's expense.

518.    It is inequitable and unfair for these Defendants to retain these benefits.

519.    The benefit these Defendants have wrongfully retained is in an amount not less than the difference between the reasonable or fair market value of the at-issue drugs for which Plaintiff paid and the actual value of the at-issue drugs these Defendants delivered.

520.    Accordingly, Defendants Eli Lilly, Novo Nordisk, Sanofi, and Express Scripts should not be permitted to retain the proceeds from the benefits conferred upon them by Plaintiff, which seeks disgorgement of these Defendants' unjustly acquired profits and other monetary

benefits resulting from their unlawful conduct and seeks restitution and/or recission, in an equitable and efficient fashion to be determined by the Court.

521.    As a direct and proximate cause of these Defendants' unjust enrichment at the expense of Plaintiff as referenced above, Plaintiff has suffered and continues to suffer ascertainable losses and damages as specified herein in an amount to be determined at trial.

## Fourth Cause of Action (Count IV)

### Civil Conspiracy
(against All Defendants)

522.    Plaintiff re-alleges and incorporates herein by reference each of the allegations from paragraph 1 through paragraph 439.

523.    Defendants' conduct described herein constitutes an agreement between two or more parties to commit an unlawful act or a lawful act by unlawful means and Defendants' overt acts in furtherance of this conspiracy caused Plaintiff's damages.

524.    Defendants aided and abetted one another to violate federal laws and Missouri law and to obtain unjust enrichment.

525.    Each Defendant agreed to and carried out acts in furtherance of the Insulin Pricing Scheme that artificially and egregiously inflated the price of at-issue drugs.

526.    Each PBM Defendant made a conscious commitment to participate in the Insulin Pricing Scheme.

602.    Each Manufacturer Defendant agreed with each other and each PBM Defendant to intentionally raise their insulin medication prices and then pay back a significant portion of those prices to the PBM Defendants.

603.    In exchange for the Manufacturer Defendants' inflating their prices and making large secret payments, the PBM Defendants agreed to and did grant preferred formulary status to the Manufacturer Defendants' at-issue drugs.

604.     Each Defendant shares a common purpose of perpetuating the Insulin Pricing Scheme, and neither the PBM Defendants nor Manufacturer Defendants alone could have accomplished the Insulin Pricing Scheme without their co-conspirators.

605.     The PBM Defendants need the Manufacturer Defendants to inflate the reported prices of their at-issue drugs and to make secret payments back to the PBM Defendants in order for the PBM Defendants to profit from the Insulin Pricing Scheme.

606.     The Manufacturer Defendants need the PBM Defendants to grant their at-issue drugs preferred formulary placement in order to maintain access to a majority of payors and diabetics.

607.     The Insulin Pricing Scheme resulted from explicit agreements, direct coordination, constant communication and exchange of information between the PBM Defendants and the Manufacturer Defendants.

608.     In addition to the preceding direct evidence of an agreement, Defendants' conspiracy is also demonstrated by the following indirect evidence that infers Defendants conspired to engage in fraudulent conduct:

•     Defendants refuse to disclose the details of their pricing structures, agreements and sales figures in order maintain the secrecy of the Insulin Pricing Scheme;

•     Numerous ongoing government investigations, hearings and inquiries have targeted the Insulin Pricing Scheme and the collusion between the Manufacturer Defendants and PBM Defendants, including:

o     In 2016, the Manufacturer Defendants received civil investigative demands from at least the State of Washington relating to the pricing of their insulin products and their relationships with the PBM Defendants;

o     In 2017, the Manufacturer Defendants received civil investigation demands from the States of Minnesota, California and Florida related to the pricing of their insulin products and their relationships with the PBM Defendants;

o     Letters from numerous senators and representatives to the Justice Department and the Federal Trade Commission in recent years asking them to investigate potential collusion among Defendants;

     o     The 2017 House Oversight committee investigation into the corporate strategies of drug companies, including t h e Manufacturer Defendants, seeking information on the increasing prices of drugs and manufacturers efforts to preserve market share and pricing power;

     o     The 2018 Senate report titled "Insulin: A Lifesaving Drug Too Often Out of Reach" aimed at addressing the dramatic increase in the price of insulin;

     o     Several 2019 hearings before both the Senate Financing Committee and the House Oversight and Reform Committees on the Insulin Pricing Scheme and the collusion between the PBM Defendants and the Manufacturer Defendants; and

     o     The Senate Finance Committee's recent two-year probe into the Insulin Pricing Scheme and the conspiracy between the Manufacturer Defendants and the PBM Defendants.

- The astronomical rise in the price of the at-issue drugs coincides with the PBM Defendants' rise to power within the pharmaceutical pricing system starting in 2003.

609.    Plaintiff was and continues to be damaged by the conspiracy when it overpaid and continues to overpay for at-issue drugs as result of Defendants' unlawful actions.

## VII.   MOTION FOR INJUNCTION

610.    Plaintiff re-alleges and incorporates herein by reference each of the allegations from paragraph 1 through paragraph 439.

611.    By Defendants' violations of RICO and common law, Plaintiff has suffered, and will continue to suffer, immediate and irreparable injury, loss, and damage, as discussed herein.

612.    The ongoing and threatened injury to Plaintiff and its beneficiaries outweighs the harm that an injunction might cause Defendants.

613.    As a direct and proximate result of Defendants' conduct in committing the above and foregoing acts, Plaintiff moves this Court for injunctive relief against Defendants pursuant to 18 U.S.C. § 1964(a), thereby enjoining Defendants from committing future violations of RICO.

614.    Granting an injunction is consistent with the public interest because it will protect

Plaintiff's and Plaintiff's Beneficiaries' health and economic interests, as well as the integrity of the Missouri marketplace.

## VIII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for entry of judgment against Defendants for the relief requested herein and to which Plaintiff may otherwise be entitled, specifically, but without limitation, including but not limited to:

A.     That the Court determine that Defendants have violated RICO, have been unjustly enriched and have engaged in a civil conspiracy;

B.     Judgment in favor of Plaintiff and against Defendants for damages in excess of the minimum jurisdictional requirements of this Court, in a specific amount to be proven at trial;

C.     That Plaintiff be granted the following specific relief: In accordance with 18 U.S.C. § 1964(a), that Defendants, their affiliates, successors, transferees, assignees, and the officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, contract, conspiracy or combination alleged herein in violation of RICO, or from entering into any other contract, conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program or device having a similar purpose or effect;

D.     That Plaintiff:

i.      be awarded restitution, damages, disgorgement, penalties and/or all other legal and equitable monetary remedies available under the state law set forth in this Complaint and the general equitable powers of this Court in an amount according to proof;

ii.     be awarded punitive damages because Defendants knowingly, willfully, wantonly and intentionally harmed the health, wellbeing and financial interests of Plaintiff and its Beneficiaries;

iii.    be awarded pre- and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of the initial complaint

in this action;

iv.     recover its costs of suit, including its reasonable attorney's fees, as provided by law and pursuant to 18 U.S.C. § 1964(c); and

v.     be awarded such other, further and different relief as the case may require and the Court may deem just and proper under the circumstances.

## IX.     JURY DEMAND

Plaintiff demands trial by jury on all issues so triable.

Date: March 11, 2024.                      Respectfully submitted,

                                           */s/ Sarah Burns*
                                           Mike Angelides #43650 (MO)
                                           Sarah Burns #56554 (MO)
                                           Holly Nighbert # 64548 (MO)
                                           SIMMONS HANLY CONROY
                                           One Court Street
                                           Alton, IL 62002
                                           Tel: (618) 259-2222
                                           Fax: (618) 259-2251
                                           mangelides@simmonsfirm.com
                                           sburns@simmonsfirm.com
                                           hnighbert@simmonsfirm.com

                                           Jayne Conroy #546090 (MA)
                                           Sona R. Shah #2927242 (NY)
                                           SIMMONS HANLY CONROY
                                           112 Madison Avenue, 7th Floor New
                                           York, NY 10016
                                           Tel: (212) 784-6400
                                           Fax: (212) 213-5949 (Fax)
                                           jconroy@simmonsfirm.com
                                           sshah@simmonsfirm.com

                                           Matthew L. Dameron #52093 (MO)
                                           WILIAMS DIRKS DAMERON LLC
                                           1100 Main Street, Suite 2600
                                           Kansas City, Missouri 64105
                                           Tel: (816) 945-7110
                                           Fax: (816) 945-7118
                                           matt@williamsdirks.com